**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jose Orlando CAICEDO–GUARNIZO,**
**Defendant-Appellant.**

No. 83–5027.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 8, 1983.

Decided Jan. 16, 1984.

Brian Sun, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Yolanda Orozco, Deputy Public Defender, Los Angeles, Cal., for defendant-appellant.

Before ALARCON and NORRIS, Circuit Judges, and EAST,* Senior District Judge.

EAST, Senior District Judge:

This is an appeal of a judgment of conviction and sentence for possession of cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). It raises the issues of the validity of an extended border search and the voluntariness of a consent to be searched. We note jurisdiction and affirm the judgment.

## I. BACKGROUND

Jose Orlando Caicedo-Guarnizo (appellant) arrived at the New Orleans International Airport on September 10, 1982, traveling on a round-trip ticket from Bogota, Colombia to Houston, Texas. He passed through the primary U.S. Customs inspection station around 4:30 p.m., and then moved on to the secondary inspection area. He appeared to be about thirty years old, was well dressed, was traveling alone, was carrying only one suitcase, and had paid for his ticket in cash. Since appellant fit the visual profile of an internal ingestion drug smuggler, he was questioned in detail. He told the inspector that he was on vacation, that he planned to meet a friend at the Houston Marriott Hotel, and that he intended to buy more clothes in Houston. He was not carrying a wallet; instead, he carried $1,200 in cash in his airline ticket folder. On the strength of the inspector's suspicions, appellant was escorted to another room for further interrogation. He stated that he was a self-employed economist; however, he was unable to give a satisfactory answer when asked to explain the theory of supply and demand. The inspectors also noted that his air fare was equivalent to about two months of appellant's stated income. Moreover, he was carrying a packet of stomach tablets, a practice typical of internal drug smugglers. Appellant was asked if he would consent to an x-ray examination; he replied that he would, but that he would file a complaint afterwards. Because there were no x-ray facilities in the inspection area, the appellant was released about fifteen minutes before the departure of his Houston flight, or about 5:15 p.m. The inspectors studied a copy of appellant's passport and concluded that it might be falsified; they contacted Houston authorities and requested that they keep appellant under surveillance.

Appellant arrived at Houston International Airport at about 6:30 p.m., where two U.S. Customs Inspectors maintained constant surveillance. He bought a ticket to Los Angeles International Airport (LAX) and boarded the flight at 7:55 p.m. The Houston agents determined that there were no reservations for either the appellant or his alleged friend at two local Marriott Hotels; they then alerted the Drug Enforcement Agency office at LAX.

Appellant arrived at LAX at about 9:40 p.m., or almost six and one-half hours after being released from his initial interrogation in New Orleans. He was immediately confronted by two U.S. Customs Inspectors, who escorted him a short distance to a secondary inspection area. The appellant was told that he did not have to answer questions. He was questioned for about two hours with at least three Government agents present. Appellant stated that he planned to stay fifteen days with a friend in Burbank, but he did not have the friend's address or phone number. He consented both orally and in writing to a pat-down search, although he was not advised that he had the right to refuse to consent. After some discussion about the validity of his passport, appellant indicated that he did not wish to discuss the matter further with anyone except the Colombian consulate.

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

Soon afterwards he consented orally and in writing to be x-rayed, although the parties disagree whether he was "requested" or "instructed" to give his consent.

Appellant was taken to a local hospital, where a general admissions form was explained to him. He signed the form, and was subsequently x-rayed. Based on the results of the x-ray, appellant was arrested and jailed. Over the next three days, he passed eighty-five oval shaped balloons containing about 576.2 net grams (approximately one and one-fourth pounds) of cocaine.

Appellant was indicted on September 23, 1982. Before trial, he moved to suppress evidence. After evidentiary hearings, the District Court granted the motion with respect to statements made without a valid waiver of *Miranda* rights. The District Court also ruled that appellant's detention at LAX was not supported by probable cause, and that there was no clear indication of internal smuggling until after appellant was x-rayed. Appellant's motion to suppress the x-rays was nevertheless denied because (1) the stop at LAX was deemed to be a valid extended border search, and (2) he was deemed to have voluntarily consented to the x-ray search. Appellant contests both of these rulings.

## II. DISCUSSION

### A. *The Extended Border Search was Valid*

 Appellant contends that the detention at LAX does not qualify as a valid extended border search, and that the subsequent seizure of evidence is therefore invalid. It is well settled that ordinary border searches need not be justified by probable cause; mere suspicion is sufficient. *Alexander v. United States,* 362 F.2d 379 (9th Cir.), *cert. denied,* 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1966). The rationale for this rule is that warrantless searches at this country's international borders are per se reasonable. *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). The "extended border" doctrine is an expansion of this rule; it permits the Government to conduct border searches some time after the border has been crossed.

 The validity of such a search depends on whether the fact finder, viewing the totality of the circumstances, is reasonably certain that the suspected smuggler did not acquire the contraband after crossing the border. *Alexander v. United States,* 362 F.2d at 382. Some of the circumstances that the fact finder should consider include the time and distance between the border crossing and the search, and the continuity of surveillance over the suspected smuggler. *Id.* This circuit has upheld an extended border search of an automobile seven hours and 105 miles from the border. *Castillo-Garcia v. United States,* 424 F.2d 482 (9th Cir.1970). It has also upheld a search fifteen hours and twenty miles from the border. *Rodriguez-Gonzalez v. United States,* 378 F.2d 256 (9th Cir.1967). Furthermore, an extended border search can be valid even where the suspect was already searched at the initial border crossing. *United States v. Espericueta-Reyes,* 631 F.2d 616 (9th Cir.1980). We do not find the time and distance intervals between New Orleans and Los Angeles, or the interruptions in the surveillance of appellant to be significant, inasmuch as the District Court was able to find with reasonable certainty that appellant had the contraband on his person at the time he entered the country. The facts of this case amply support that conclusion.

Appellant also argues that because of the delayed nature of an extended border search, it necessarily entails a greater level of intrusion on legitimate expectations of privacy than an ordinary border search; therefore, it must be justified by a higher standard of certainty: "reasonable suspicion." He cites two cases from other circuits that adopt this position. *See United States v. Garcia,* 672 F.2d 1349 (11th Cir. 1982); *United States v. Niver,* 689 F.2d 520 (5th Cir.1982). Such a position is consistent with this circuit's suggestion that the standard of suspicion for extended border searches might be stricter than the standard for ordinary border searches. *United*

*States v. Espericueta-Reyes,* 631 F.2d at 621. Such a stricter standard respects basic Fourth Amendment concepts by striking a sensible balance between the legitimate privacy interests of the individual and society's vital interest in the enforcement of customs laws.

Finally, appellant argues that there comes a point, regardless of the degree of certainty, where a suspect's relationship with the border becomes so attenuated that customs officials should no longer have the right to detain him without a warrant. This argument is hardly subject to dispute; rather, the question is one of degree. The answer lies within the rationale for the extended border doctrine. Appellant argues that the sole rationale is to permit customs officials to apprehend, or "sweep in" the suspect's accomplices, and that in this case, the Government does not urge this as its purpose. However, this circuit has recognized that a legitimate purpose of extended border searches is to bolster an arguably marginal suspicion by further observation of the suspect. *United States v. Bilir,* 592 F.2d 735 (4th Cir.1979).

Again, however, we note that the practice of postponing a border search solely to observe a suspect may be limited by constitutional considerations. *See id.* at 740 n. 9; *United States v. Espericueta-Reyes,* 631 F.2d at 620 n. 4. We approve of the purpose in this case because of the following significant facts. First, the customs agents were unable to x-ray appellant during the initial border crossing, since they had no x-ray facilities. Second, the agents made every reasonable effort to completely search and interrogate appellant before allowing him to pass through the border. Third, as the District Court found, the Government lacked probable cause to obtain an arrest warrant, so the Government did not have that alternative. Fourth, the custom agents' surveillance of the appellant while in Houston established that appellant,

while at the New Orleans Airport, had lied about his mission in Houston. Given these considerations, we hold that it was proper for the Government to continue surveillance of appellant, and that his relationship with the border was not yet so attenuated that it was beyond the rationale of the extended border doctrine. Having decided that the detention at LAX was valid, we turn next to the question whether the x-ray search was lawful.

### B. *Voluntariness of the Appellant's Consent to be Searched*

The District Court found that appellant had freely and voluntarily consented to the x-ray search and ruled that the search was valid.[1] Appellant argues that this finding is erroneous. He alleges that the agents told him to sign the consent forms, and that the agents in New Orleans informed him that customs agents possessed the authority to conduct an x-ray search with or without his consent.

"[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). This court will reverse the District Court's finding of consent only if the finding is clearly erroneous. *United States v. Fleishman,* 684 F.2d 1329, 1334 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982).

Appellant signed a form in his native language at the airport in which he consented to the x-ray search; he signed another consent form at the hospital just before the x-rays were taken. Appellant testified before the District Court, and he argues now, that the custom agents instructed him to sign the forms, thereby

---

1. The Government also argued in District Court that the x-ray search was valid because it was within the scope of a border search. The court, however, found that the Government failed to offer sufficient evidence to meet the *"clear indication"* test or standard required to search by x-ray someone suspected of being an internal body smuggler. *See United States v. Quintero-Castro,* 705 F.2d 1099, 1100 (9th Cir.1983); and *United States v. Ek,* 676 F.2d 379, 382 (9th Cir.1982).

invalidating the consent for lack of voluntariness. The custom agents also testified, however, stating that they did not instruct the appellant to sign the forms, but only requested that he do so. The agents also testified that they informed appellant that he could refuse to consent to the search, a fact which appellant denied in his testimony. After making its credibility determination and weighing the conflicting evidence, the District Court found that the agents had only requested that appellant sign the forms. The District Court also specifically found that the agents informed the appellant that he could refuse to consent to the search. Although we might not have made the same credibility determination as the District Court had we decided the case in the first instance, we cannot say that the District Court's findings are clearly erroneous. The District Court had the benefit (that we lack) of the live testimony of the witnesses, and the opportunity to observe their demeanor. The District Court chose to believe the testimony of the Government agents. Appellant has presented no showing at law or of evidence that the District Court clearly erred.

Appellant also argues that his consent was involuntary because the New Orleans agents had told him that custom agents possessed the authority to perform an x-ray search with or without his consent. Had the agents actually made such a statement, we would be hard pressed to find a voluntary consent. *See Bumper v. North Carolina,* 391 U.S. 543, 548–50, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968) (Supreme Court invalidated a consent to search after a claim of authority, reasoning that an element of coercion is inherent in such a consent situation). The District Court, however, never found that the agents made such a statement. Although appellant testified that the New Orleans officials told

him that custom agents could x-ray him with or without his consent, the customs agents testified that no such statement was ever made. One of the agents did testify that appellant "was informed that if x-rays were taken, they would be done under clinical conditions, that we [the agents] did not personally take x-rays." [2] Once again, the District Court made its credibility determination in favor of the Government agents. The appellant has presented nothing to convince us that the District Court clearly erred.

Thus, we cannot say that the District Court was clearly erroneous when it found that appellant voluntarily and freely consented to the search.

The judgment of conviction and sentence entered by the District Court on January 3, 1983, is affirmed.

AFFIRMED.

---

**2.** After the agents finished interviewing the appellant, one of the agents prepared a report in which he attempted to reconstruct the questions and answers made during the interview. According to the report, the agent told appellant during the interview that "We [the agents] do have the authority to examine you under clinical conditions, if normal conditions are not sufficient." According to the testimony during

the District Court hearing, the agent only meant by this statement that the agents would have the x-rays taken in a clinical setting, i.e., a hospital, and would not perform the x-rays themselves. The report contains no statement that custom agents have authority to conduct an x-ray search with or without a person's consent.