**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**JUVENILE (RRA–A), Defendant–**
**Appellant.**

**No. 98–50368.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 1999

Filed Dec. 15, 1999

Joseph J. Burghardt, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Renee M. Bunker, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: D.W. NELSON, REINHARDT, and TROTT, Circuit Judges.

D.W. NELSON, Circuit Judge:

Juvenile RRA–A appeals her conviction for juvenile delinquency, in violation of 18 U.S.C. § 5032, and for conspiring to knowingly and intentionally import and attempt to import marijuana, in violation of 21 U.S.C. §§ 952, 960, 963. She claims that (1) the district court erred in failing to suppress the fruits of a warrantless arrest not based on probable cause; (2) the district court erred in finding no prejudicial violations of 18 U.S.C. § 5033's notification requirements; and (3) the district court erred in failing to find that the government violated the timely arraignment provision of 18 U.S.C. § 5033. We hold that, although violations of 18 U.S.C. § 5033 occurred, they were not prejudicial, and thus we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 18, 1999, at approximately 9 a.m., RRA–A was the front seat passenger in a vehicle crossing from Mexico into the United States. Other than briefly showing the inspector her border crossing card, RRA–A read a newspaper at the primary inspection booth. Immediately after the inspector asked the rear passenger to move over, however, RRA–A put down her newspaper and invited the inspector to the party that the three vehicle occupants were throwing. As the rear passenger moved over, the inspector noticed that the seat under him had no indentations. The inspector moved the vehicle to secondary inspection, where the vehicle occupants were brought into an office and frisked while a narcotics dog discovered 80.10 pounds of marijuana in the vehicle. RRA–A testified that she felt free to go at that time.

After the marijuana was found, RRA–A was handcuffed to a bench in a locked security office, where she remained for the next four hours. When Agent Jacobo arrived at approximately 12:00 p.m., he found out that RRA–A did not have a home telephone number. He then contacted Assistant U.S. Attorney Annie Gutierrez and told her that he had a minor in custody whose parents could not be reached because they did not have a telephone. He also told her that the minor did not wish for her parents to be notified. Gutierrez told Agent Jacobo that she would notify the Mexican consulate to see if it could assist in locating RRA–A's parents.

At approximately 1:30, Agent Jacobo, who speaks Spanish, told RRA–A that she was under arrest and gave her a form in Spanish with *Miranda* rights to read and initial. Agent Jacobo asked her if she understood each paragraph, including the one regarding her right to a lawyer, and had her initial each paragraph. The agent asked her if she had any questions about the rights, but in his testimony did not recall her having any. He then proceeded to question her for thirty to forty minutes. RRA–A testified that the agent spoke in a loud voice, and repeatedly admonished her to tell the truth when she denied involvement. Agent Jacobo testified that the agents and RRA–A were sitting; RRA–A was not handcuffed; he did not physically threaten her, raise his voice, yell, point weapons at her, or make promises to her; and that RRA–A appeared alert and responsive. After multiple denials, RRA–A cried and confessed to involvement in the crime. At the end of the interview, Agent Jacobo asked RRA–A if she wanted to use a telephone.

Meanwhile, at some unspecified time that day which appears to have been between 12:00 p.m. and 2:45 p.m., Gutierrez tried to reach the consulate but got no answer. Because Gutierrez had a meeting, she then asked a legal secretary to "contact the Consulate and inform them of the minor's detention, the charges, the place where she would be taken, the arraignment, and the fact that [the U.S. attorney's office] could not contact the parents as they did not have a telephone." Agent Jacobo did not know whether the consulate was actually contacted before or after the interrogation took place.

At 2:45, over an hour after interrogation commenced, Gutierrez' secretary reached the Mexican consulate. She advised them of RRA–A's arrest, location, and available parental information; the district court found no evidence that the consulate was informed of RRA–A's rights. The Consul requested to speak with RRA–A.

Early the next morning, on March 19, 1998, Consul Salinas called Gutierrez and told her that he had visited RRA–A the night before and convinced her to give him a neighbor's telephone number. Through the neighbor, Salinas had reached RRA–A's parents. That same morning, Salinas called Gutierrez and told her that the parents lacked border crossing documents; Gutierrez assisted the parents in obtaining them.

Two days after her arrest, on March 20, 1998, RRA–A was arraigned. On April 3, 1998, RRA–A filed motions to suppress statements, compel discovery, and preserve evidence. On April 10, 1998, the United States responded and filed a reciprocal discovery motion. RRA–A filed a supplemental motion to dismiss based on improper certification pursuant to the Juvenile Delinquency Act and the government responded on April 15, 1998. A motions hearing and bench trial occurred on April 17, 1998. The district judge found the pending discovery motions moot and denied RRA–A's motions to suppress and dismiss. The judge then convicted her of juvenile delinquency, in violation of 18 U.S.C. § 5032 (Supp. IV 1998), and of conspiring to knowingly and intentionally import and attempt to import marijuana, in violation of 21 U.S.C. §§ 952, 960 & 963 (Supp. IV 1998). RRA–A timely appeals.

## STANDARD OF REVIEW

 This court reviews de novo a district court's determination that probable cause supported a warrantless arrest and reviews for clear error the finding of facts underlying the determination. *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). This court generally reviews de novo mixed questions of fact and law, but reviews for clear error mixed questions in which the factual issues predominate. *See United States v. McConney,* 728 F.2d 1195, 1200–04 (9th Cir.1984). This court views parental notification under the Juvenile Delinquency Act as a predominantly factual question, which it therefore reviews for clear error. *See United States v. Doe,* 862 F.2d 776, 779 (9th Cir.1988). A "statutory claim based on the speedy arraignment provision presents a mixed question of law and fact for which *de novo* review is appropriate." *Id.* This court, at its discretion, can review for plain error issues raised for the first time on appeal when no new factual development is needed. *See United States v. Tisor,* 96 F.3d 370, 378 (9th Cir.1996).

## DISCUSSION

### I. Probable Cause During Warrantless Arrest

RRA–A claims that the government lacked the particularized probable cause required to arrest RRA–A as a passenger in the car. *See Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). Her contention fails, however, because the district court did not err in finding probable cause based on RRA–A's party invitation at the moment at which the inspector asked the rear passenger to move over to the other side of the car. *See Ornelas,* 517 U.S. at 699, 116 S.Ct. 1657.

### A. Time of Arrest

 As a preliminary matter, the parties dispute when the arrest occurred. The standard for the timing of RRA–A's arrest is when a reasonable person "would have believed [s]he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The government has more latitude to detain people lawfully in a border-crossing context, *see United States v. Ogbuehi,* 18 F.3d 807, 812–13 (9th Cir.1994), but such detentions are acceptable only during the time of extended border searches, *see, e.g., id.* (detained and searched soon after crossing border); *United States v. Caicedo–Guarnizo,* 723 F.2d 1420, 1422 (9th Cir. 1984) (detained and x-rayed after entering United States by plane).

 Based on this case law, the district court properly determined the time of arrest as when RRA–A was handcuffed. RRA–A claims that she was arrested at the time of her detention in the security office, prior to the discovery of marijuana and handcuffing. Her argument, however, fails to address the fact that this court allows lawful detention during border searches, *see Ogbuehi,* 18 F.3d at 812–13; *Caicedo–Guarnizo,* 723 F.2d at 1422, and that she believed herself free to go at that time. Although frisking her in a security office certainly constituted a detention, it did not rise to the level of an arrest until she was handcuffed.

The government's claim that RRA–A was not arrested until she was formally told she was under arrest and read her *Miranda* rights is similarly flawed. RRA–A was handcuffed after the narcotics were found in the vehicle, separating that detention from the search itself. A reasonable person handcuffed for four hours in a locked security office after a narcotics search "would have believed [s]he was not free to leave." *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870. Given the totality of circumstances, therefore, RRA–A's handcuffing was the clearest indication that she was no longer free to leave and we therefore find it to be the point of arrest.

B. Probable Cause

■■■ Having established the time of arrest, we turn to the question of whether RRA–A's behavior up to the time of her handcuffing provided a particularized enough ground for probable cause. RRA–A's potentially suspicious behavior consisted of the following. She ignored the inspector, reading a newspaper except for briefly presenting her documents, until the inspector asked the rear passenger to move over to the other side of the car. She then looked up and invited the inspector to a party, an invitation which the rear passenger echoed. By moving, the rear passenger shifted from covering the drugs to uncovering them.

We hold that this behavior constituted sufficient grounds for probable cause. RRA–A was not a mere passenger, but changed her behavior in a potentially distracting way at the very moment when the inspector was likely to discover the unusual bulge in the seat. The arrest therefore did not rely upon "mere propinquity to others independently suspected of criminal activity." *Ybarra*, 444 U.S. at 91, 100 S.Ct. 338. Her "relationship, attitude, conduct, [and] utterance" provided a "basis for a rational attribution that [s]he had some interest in the marijuana itself." *Bettis v. United States*, 408 F.2d 563, 568 (9th Cir. 1969); *see also United States v. Buckner*, 179 F.3d 834 (9th Cir.1999).

The cases relied upon by RRA–A are distinguishable from the facts here. In *United States v. Soyland*, 3 F.3d 1312 (9th Cir.1993), Soyland was merely present in a vehicle being searched before he was personally searched. Unlike RRA–A, he did not make any suspicious utterances. *See id.* at 1314. Similarly, in *United States v. Robertson*, 833 F.2d 777 (9th Cir.1987), Steeprow was leaving the house when the police came to arrest Johnson. She was merely present at the house and so this court found no probable cause existed to arrest her. *See id.* at 782. Because the instant case does not involve mere presence, but behavior which the district court,

after analyzing the testimony, appropriately found to be suspicious, *Soyland* and *Robertson* do not provide a basis for reversal. We thus affirm the holding that probable cause supported the arrest.

## II. Section 5033 Notification Requirement

RRA–A claims that the government violated 18 U.S.C. § 5033's notification requirement in two main ways: (1) failure to notify RRA–A of her rights until four hours after she was taken into custody and to notify her in a language she could understand; and (2) failure to notify her parents or the consulate of her rights prior to interrogation.

■■■ This circuit has a three-part test for whether violations of the Juvenile Delinquency Act deprive juvenile defendants of their due process rights. First, did the government violate the Juvenile Detention Act's requirements? If so, second, was the government's conduct so egregious that it deprived the juvenile of due process of law? If the answer to the second question is "no," third, "was the violation harmless to the juvenile beyond a reasonable doubt?" *United States v. Doe*, 862 F.2d 776, 779 (9th Cir.1988) [hereinafter *Doe II* ]. We conclude that violations of the Juvenile Detention Act's requirements occurred, but hold that RRA–A's due process rights were not violated and the statutory violation was harmless beyond a reasonable doubt.

### A. Violation of Section 5033

■■■ Regarding the first prong of the test, we find that two violations of section 5033 occurred. With respect to RRA–A's first claim, section 5033 requires that the arresting officer "immediately advise [the] juvenile of his legal rights, in a language comprehensible to a juvenile." 18 U.S.C. § 5033. Because we have found that the arrest occurred at the point of handcuffing, RRA–A was in custody for four hours prior to being read her rights. Although no

case law seems to interpret what "immediately" means in a section 5033 context, a four-hour delay does not seem immediate.

RRA–A's further claim that she was not read her rights in a language she understood is not, however, supported by the record. As noted above, her rights were administered in Spanish by an agent fluent in Spanish who asked her if she understood them paragraph by paragraph and asked her if she had any questions. The totality of circumstances thus suggests that her waiver of *Miranda* rights was knowing and voluntary. *See United States v. Bernard S.*, 795 F.2d 749, 753 (9th Cir. 1986).

With respect to RRA–A's second claim, section 5033 states that "the arresting officer ... shall immediately notify ... the juvenile's parents, guardian, or custodian of such custody. The arresting officer shall also notify the parents, guardian, or custodian of the rights of the juvenile and of the nature of the alleged offense." 18 U.S.C. § 5033. In interpreting this provision, this circuit has explained that "[r]easonable efforts should be made to notify the parents of any juvenile taken into custody. For those juveniles whose parents live outside the United States, if it is not feasible to notify a parent or guardian, the government could alternatively notify a foreign consulate in the United States." *United States v. Doe*, 701 F.2d 819, 822 (9th Cir.1983) [hereinafter *Doe I* ].

This court has not addressed, however, when the consulate must be notified or what purpose such notification serves. We clarify this issue here. In a recent opinion, this court explained that "parental notification of the juvenile's *Miranda* rights must be given contemporaneously with the notification of custody." *United States v. Doe*, 170 F.3d 1162, 1167 (9th Cir.1999) [hereinafter *Doe III* ]. This timing is necessary to ensure that section 5033 provides juveniles with "meaningful protection." *Id.* at 1168.

Applying this concept to the context of consular notification, we hold that the arresting officer must make reasonable efforts to notify the consulate prior to interrogation. The purpose of notifying the consulate of the arrest is to facilitate contact with the parents. Arresting officers often have difficulty reaching parents in foreign countries, particularly when juveniles do not cooperate. However, juveniles cannot waive their right to parental notification even if they hinder notification. *See United States v. L.M.K.*, 149 F.3d 1033, 1035 (9th Cir.1998). Consular notification addresses this problem by providing an in-country mechanism for locating parents of alien juveniles. We note, therefore, that the arresting officer need not notify the consulate of the juvenile's rights because the notification serves merely as a mechanism of reaching the parents.

In order to allow the parents to become involved at a meaningful point in the process, consular notification must occur as soon as reasonably possible after the arresting officer has difficulty contacting the alien juvenile's parents. Because consulates generally can be reached expeditiously, the arresting officer must read the juvenile his or her *Miranda* rights but delay interrogation of the juvenile for a reasonable time to allow consular notification and response. We recognize, however, that the timely arraignment requirements of section 5033 require minimal delays. If the contacting of the consulate and its response cannot occur within a reasonable time, such as a few hours, the arresting officer may proceed with interrogation and arraignment. Furthermore, delays due to consular notification constitute extenuating circumstances, which may excuse a longer wait for arraignment or interrogation.

Applying this logic to the instant case, Agent Jacobo, the arresting officer, provided insufficient notification. In addition to failing to contact the consulate directly, *see Doe III*, 170 F.3d at 1167–68,

Agent Jacobo did not wait a reasonable amount of time to allow contact with the consulate. Gutierrez's secretary reached the consulate just over an hour after interrogation began. By delaying a few hours, Agent Jacobo would have been able to determine whether the parents could be expeditiously located. We therefore hold that the arresting officer violated section 5033 by failing to make sufficient pre-interrogation efforts to contact the consulate.

## B. Due Process Violation

Having established two violations of section 5033, the question now becomes whether either of them constitutes government conduct so egregious that it deprived RRA–A of due process of law. *See Doe II*, 862 F.2d at 779. We find that neither of these violations is sufficiently severe.

■■ First, although a four-hour delay in reading rights violates the immediacy requirement of section 5033, RRA–A was read her rights before any interrogation took place. Because the primary purpose of reading *Miranda* rights is to provide a procedural protection against self-incrimination, *see Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and RRA–A was read her rights before she incriminated herself, the delay does not constitute a due process violation.

■■ The second section 5033 violation involves timeliness of parental and consular notification. In *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Supreme Court held that failure to give parents timely notice of a hearing "in which a youth's freedom and his parents' right to his custody are at stake" violates due process. *Id.* at 33–34, 87 S.Ct. 1428. This court, however, has held that interrogation without parental notice does not provide a basis for suppressing the resulting confession on due process grounds. *See Doe III*, 170 F.3d at 1168; *Harris v. Wright*, 93 F.3d 581, 586 (9th Cir.1996). The failure to make reasonable efforts to

notify the consulate of custody and rights prior to interrogation therefore does not constitute a due process violation under this circuit's law.

## C. Harmlessness

Because section 5033 violations occurred which were not egregious enough to constitute due process violations, we next turn to a determination of the harmfulness of these errors. *See Doe II*, 862 F.2d at 779. "If the statutory violations did not rise to the level of constitutional violations but nonetheless prejudiced [RRA–A], [the panel] ha[s] discretion to reverse or to order more limited remedies so as to ensure that her rights are safeguarded and the will of Congress is not thwarted." *Id.* at 780–81. "[W]e inquire whether the violation caused the juvenile to confess." *Doe III*, 170 F.3d at 1168.

■■ Here, the record does not convince us that RRA–A suffered prejudice due to the section 5033 violations. The district court found only one section 5033 violation, the failure to notify the consulate of RRA–A's constitutional rights, which we hold today does not violate section 5033. The court therefore addressed prejudice only with respect to that issue. The judge explained that no prejudice existed because the consulate had no right to intervene with the interrogation and her *Miranda* waiver was knowing and voluntary.

No remand is necessary, however, because the district judge's reasoning regarding prejudice applies to the section 5033 violations found above. "This court gives special deference to the district court's credibility determinations." *United States v. Nelson*, 137 F.3d 1094, 1110 (9th Cir.1998). The district judge specifically found that RRA–A seemed mature and intelligent. During the inspection, for instance, RRA–A was calm and collected as she sought to divert the inspector from the marijuana, while her cohorts were visibly nervous. The judge concluded that her behavior at the border indicated that she was not simply a "timid, frightened

juvenile." The judge used these findings to determine that the *Miranda* waiver was knowing and voluntary.

Based on these factual determinations, we hold that the section 5033 violations did not result in prejudice to RRA–A. Although the government failed to make reasonable efforts to notify the consulate of custody and rights prior to interrogation, the failure did not prejudice RRA–A because the violations did not cause the juvenile to confess. Her *Miranda* waiver was knowing and voluntary despite the violations.

*III. Section 5033 Timely Arraignment*

 RRA–A also claims that the 48–hour delay in arraigning her violates section 5033's timely arraignment provision. RRA–A raises this argument for the first time on appeal. The panel therefore has discretion to review this argument for plain error if no further factual development is needed. *See Tisor,* 96 F.3d at 378.

We do not choose to exercise our discretion, however, because further factual development is needed to address this issue. The case law clearly indicates that a delay of 36 hours without extenuating circumstances violates section 5033's arraignment provision. *See L.M.K.,* 149 F.3d at 1035; *Doe* 862 F.2d at 780. Because this issue was not raised below, the district court made no finding regarding extenuating circumstances. Similarly, the district court did not examine whether the arraignment delay caused prejudice. We therefore decline to reach this issue.

### CONCLUSION

For the foregoing reasons, we AFFIRM the district court's conviction.

REINHARDT, Circuit Judge, dissenting.

While I agree with the majority's opinion that there was probable cause to support the warrantless arrest and also with its conclusion that Section 5033 was violated, I disagree with significant parts of the discussion regarding the latter issue. Most important of all, however, I strongly disagree with the majority's ultimate conclusion that the Section 5033 violation was harmless. Accordingly, I dissent.

### I. The Section 5033 Violation.

While the majority correctly determines that Section 5033 was in fact violated, I have three concerns about the reasoning my colleagues use in arriving at their conclusion. The first relates to the purpose that consular notification serves. The second involves *who* must give the notice required by statute. The third is the majority's description of the "three-part test."

With respect to the first issue, although I agree with the majority that consular notification "must occur as soon as reasonably possible . . . ," and that the arresting officer should "delay interrogation of the juvenile for a reasonable time to allow consular notification and response," I disagree with the statement that "consular notification serves merely as a mechanism for reaching the parents." If the purpose of consular notification were so limited, then requiring such notification prior to interrogation would be of little consequence. Even if the consular officials were notified immediately, they would ordinarily be unable to advise the juvenile's parents in time to, in the words of the majority, "allow the parents to become involved at a meaningful point in the process." Arrangements must be made for entry into the U.S., which takes some time. In this case, for example, more than 24 hours elapsed before Jane Doe's parents were admitted to the country. In other cases, the juvenile's parents may be even farther away, or the process of arranging their entry may, for any number of reasons, consume considerably more time.

One of the primary purposes of consular notification is to permit diplomatic officials to act as proxies for parents who are not in the country and thus cannot "become involved at a meaningful point in the pro-

cess." In such cases, children will be deprived of parental involvement at what is often a critical stage unless consular representatives participate in their stead. More important, we have *already* implicitly recognized that consular involvement is in fact one of the purposes of the consular notification requirement. In *Doe II*, we wrote: "[i]f the prosecution resulted from the confession and the confession came in part as a result of Doe's isolation from family, friends, *representatives of his country* or an attorney, then the statutory violations must be said to have prejudiced Doe." *United States v. Doe,* 862 F.2d 776, 781 (9th Cir.1988) (*Doe II* ) (emphasis added). Simply put, the juveniles in question have the right to the presence of their parents, *or* of those who serve in loco parentis-namely, consular representatives-at the time of the interrogation.

Moreover, the approach the majority suggests does not fit within the larger context of international obligations and practices. If an American were arrested in Iran or Turkey, we would insist that an American consular officer be allowed to come to the prison and advise that person of his rights at the earliest possible time.[1] In fact, American consular officers assert their rights to advise Americans frequently and aggressively.[2] Viewing our *Doe II* precedent as I have suggested would allow consular officials to converse with youthful arrestees at "a meaningful point in the process"-before they are persuaded to forego their rights, and, perhaps, to confess to offenses they did not commit.

Second, in considering whether or not Section 5033 was violated, the majority fails to address directly the question of responsibility: specifically, *who,* according to the statute and Ninth Circuit case law, must contact either the parents or the consul. Section 5033 provides that "[t]he *arresting officer* shall also notify the parents, guardian, or custodian of the rights of the juvenile and of the nature of the alleged offense." 18 U.S.C.A. § 5033 (emphasis added); *see also United States v. Doe,* 170 F.3d 1162, 1167 (9th Cir.1999) (*Doe III* ) (holding that the arresting official, not a subsequent official, is responsible for notification). In this case, however, delegation upon delegation occurred, thereby unnecessarily compounding the delay and virtually ensuring that, as happened here, any interrogation would be over by the time the consulate was in fact contacted. Thus, Section 5033 was violated not just by the unnecessary delay in contacting the consulate, but also by the unauthorized delegation of duty which contributed to that delay.

Third, although the proposed opinion subsequently applies the proper test for evaluating violations of Section 5033, it clearly errs, and errs significantly, in *describing* that test. The opinion states that the purpose of the test is to determine (whether juveniles have been deprived "of their due process rights"—that is, of their *constitutional* rights). Majority Op. at p. 1003–04. That, however, is a more narrow purpose than the law actually entails. The ultimate question is not whether a statutory violation constitutes a constitutional vio-

---

1. At the U.S. State Department's website, the Department describes aid to Americans arrested or incarcerated while abroad as "[o]ne of the most essential tasks of the Department of State and of U.S. embassies and consulates abroad...." U.S. State Department, *Assistance to U.S. Citizens Arrested Abroad* (visited October 23, 1999) http://travel.state.gov/arrest.html. According to the State Department's own information sheet, consular services upon initial notification of arrest include: 1) visiting the prisoner as soon as possible after notification of the arrest; 2) providing a list of local attorneys to assist the prisoner in obtaining legal representation; 3) providing information about that country's judicial procedures; 4) notifying family and friends, if so authorized; and 5) relaying requests to family and friends for money or other aid. *Id.*

2. Under Article 36(1)(c) of the Vienna Convention on Consular Relations, consular officers have the right to visit their nationals in custody, "to converse and correspond with [them] and to arrange for [their] legal representation."

lation, but whether a statutory violation warrants redress. If the statutory violation constitutes a violation of the juvenile's due process rights, we have our answer and we can stop our inquiry. However, if no due process violation has occurred, we must proceed further with the inquiry and determine whether the statutory violation was harmless. *See Doe II*, 862 F.2d at 779, 780–81. In fact, if the ultimate question were whether a due process violation occurred, there would be no third prong to the test.[3] Thus, the majority's description of the process we follow in examining claims of Section 5033 violations is inaccurate and incomplete, and introduces unnecessary confusion into our previously unambiguous description of the proper test. *See Doe II*, 862 F.2d at 779.

## II. The Harmlessness of the Section 5033 Violations

Finally, I disagree with the majority's conclusion as to the harmlessness of the Section 5033 violations. After erroneously stating that the inquiry involves determining whether the juvenile was deprived of her due process rights, the majority proceeds to ignore its own statement and accurately quotes the controlling case law declaring that Section 5033 violations require reversal unless the violation in question is "harmless *beyond a reasonable doubt.*" *Doe II*, 862 F.2d at 780–81. This is a particularly stringent standard, and one that, notwithstanding the majority's contrary assertion, is not met in the present case.

In this case, as the majority holds, Doe was arrested at the moment she was handcuffed to the bench. This sixteen year-old girl remained so constrained for approximately four hours before her interrogation began, and she was deprived of both parental and consular involvement, not only during that four hour pre-interrogation period, but during the course of the interrogation itself. She denied her guilt repeatedly under questioning, until finally she broke down and tearfully confessed.

Nevertheless, the majority concludes that the Section 5033 violation did not offend due process, *and* that the error was harmless. Although I agree that the violation in question did not offend due process, the error was certainly not harmless beyond a reasonable doubt. As the majority recognizes, when it ultimately applies the proper test, "[i]f the statutory violations did not rise to the level of constitutional violations but nonetheless prejudiced" the juvenile, the panel must reverse or remand (whichever in its discretion it deems to be appropriate) in order to ensure that the juvenile's rights are safeguarded. *Doe II*, 862 F.2d at 780–81.

Simply put, the prejudice in the case before us is this: the failure to notify the consulate in a timely manner prior to interrogation "needlessly isolated this juvenile in a strange environment and deprived [her] of support and counsel during the pre-arraignment period." *Doe II*, 862 F.2d at 781. As a result, after repeatedly denying her culpability, Doe ultimately made statements that were highly prejudicial, without having had an opportunity to obtain advice from anyone she trusted.[4]

**3.** In *Doe II*, we wrote that: "Our inquiry ... proceeds in three stages. First, we address whether the government violated the requirements of the Juvenile Delinquency Act. If it did, we reach the second question: whether the government's conduct was so egregious as to deprive Doe of his right to due process of law. If it was not, we reach the third question: was the violation harmless to the juvenile beyond a reasonable doubt?" *Doe II*, 862 F.2d at 779. With respect to the third stage, we went on to note that "[i]f the statutory violations did not rise to the level of constitu-

tional violations but nonetheless prejudiced Doe, we have discretion to reverse or order more limited remedies so as to ensure that Doe's rights are safeguarded and the will of Congress is not thwarted." *Id.* at 780–81.

**4.** In this case, Doe was in a foreign country, surrounded by people who spoke a language she did not understand, and in the maw of a judicial system very different from her own. She was not offered the opportunity to make a phone call either prior to or during the interrogation. During the interrogation itself,

That opportunity is precisely what the statute is designed to ensure.[5] Moreover, the fact that the Consul was able to persuade Doe to tell him how to contact her parents bolsters the argument that earlier contact with the consulate would have made her feel less isolated, and would have enabled her to decide whether to make a knowing and voluntary waiver of her rights. As a result, I cannot agree that the violation in question was harmless. Accordingly, I dissent.

the juvenile repeatedly denied participating in the criminal conduct. Nevertheless, the agents continued to press her, telling her that she would likely go to jail for a long time. Finally, after being questioned at length by the agent, Doe broke down and wept. She then told the agents that she had acted unlawfully. This picture is very different from the one drawn both in the district court and in the majority's opinion.

5. For example, in *United States v. Indian Boy X*, 565 F.2d 585, 591 (9th Cir.1977), we based our decision rejecting a timely arraignment challenge under § 5033 on the officers' "scrupulously fair" explanation of the boy's rights to the parents, and the parents' presence at the time the juvenile waived his *Miranda* rights.