**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

v.

MAHER HAMDAN ABBOUCHI,
                    *Defendant-Appellant.*

No. 05-50962

D.C. No.
CR-05-00159-PA

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
October 18, 2006—Pasadena, California

Filed July 13, 2007
Amended September 6, 2007

Before: Harry Pregerson, Ronald M. Gould, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Pregerson

11743

## COUNSEL

Gail Ivens, Acting Federal Public Defender, Los Angeles, California, for the defendant-appellant.

Douglas M. Fuchs, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

## ORDER

Plaintiff-Appellee's Petition for Rehearing, filed July 23, 2007, is GRANTED. We make the following amendments to our opinion filed on July 13, 2007:

**1.** On page 8449 of the slip opinion, after the sentence "Abbouchi challenges several aspects of his supervised release conditions." replace the next sentence with "We remand for the limited purpose of resentencing Abbouchi after the district court has the opportunity to reconsider its imposition of the domestic violence treatment condition and its associated payment condition."

**2.** On page 8450 of the slip opinion, after "*See Jordan*, 256 F.3d at 926 (quoting *Johnson*, 520 U.S. at 466-67)." delete the rest of the paragraph except footnote six. Insert the following new paragraph, and move footnote six to the end of this new paragraph:

Because Abbouchi did not object to the imposition of a domestic violence treatment condition before the district court, the district court did not need to resolve Abbouchi's factual challenges to the presentence report. *See* Fed. R. Crim. P. 32(i)(3)(B) (district court need not resolve disputed matters that will not affect sentencing). Therefore, the district court declined to resolve Abbouchi's objections to paragraphs sixty through seventy of the presentence report, which provided examples of Abbouchi's alleged physical and emotional abuse of his wife. Given the lack of objection to the domestic violence treatment condition and the seriousness of the allegations of spousal abuse, we vacate Abbouchi's sentence and remand to the district court for the limited purpose of resentencing Abbouchi after the district court has had the opportunity to reconsider the imposition of Abbouchi's domestic violence treatment condition and its associated payment condition. *See, e.g., United States v. Doe*, 488 F.3d 1154, 1163 (9th Cir. 2007) (issuing a limited remand to the district court with instructions that the district court give advance notice of any nonstandard conditions of supervised release and that the defendant be allowed to object to the imposition of any of those conditions where the district court erroneously imposed certain supervised release conditions without notice); *United States v. Decoud*, 456 F.3d 996, 1022 (9th Cir. 2006) (issuing a limited remand to allow the district court the opportunity to reconsider the imposition of an un-objected to supervised release term); *see also United States v. Matthews*, 278 F.3d 880, 885 (9th

Cir. 2002) (en banc) ("[A]s a general matter, if a district court errs in sentencing, we will remand for resentencing on an open record — that is, without limitation on the evidence that the district court may consider.").

**3.** On page 8451 of the slip opinion, replace the last sentence of the opinion, which reads "We remand for resentencing without the domestic violence treatment condition." with "We remand for the limited purpose of resentencing Abbouchi after the district court has had the opportunity to reconsider the imposition of Abbouchi's domestic violence treatment condition and its associated payment condition."

Further petitions for rehearing will be entertained by this panel if timely made.

**PETITION GRANTED.**

---

## OPINION

PREGERSON, Circuit Judge:

In this case, we consider the contours of a customs official's border search authority at a regional sorting hub for express consignment services like those offered by UPS. We hold that customs inspections conducted at UPS's regional sorting hubs like the one at Louisville, Kentucky, take place at the functional equivalent of the border.

Defendant-Appellant Maher Hamdan Abbouchi was convicted and sentenced for having committed four counts of transfer of false identification documents in violation of 18 U.S.C. § 1028(a)(2). The government brought criminal charges against Abbouchi after U.S. Bureau of Customs and Border Protection ("Customs") officers who conducted ran-

dom customs inspections of cargo at the UPS sorting hub in Louisville opened a package sent by Abbouchi to Lebanon. The package contained counterfeit social security and resident alien identification cards. The district court denied Abbouchi's motion to suppress this incriminating evidence, and a jury found him guilty as charged.

Abbouchi timely appeals. He contends on appeal that the contents of his UPS package were inadmissible in evidence and should have been suppressed. He argues that the Customs officers needed reasonable suspicion to open his UPS package because the UPS hub at Louisville is not the functional equivalent of the border, but rather is part of the "extended border." He also argues that social security cards are not "identification documents" within the meaning of § 1028(a)(2). Finally, Abbouchi challenges several aspects of the district court's supervised release conditions.

We have jurisdiction under 28 U.S.C. § 1291. We affirm his convictions, but vacate his sentence and remand for resentencing.

## I.   FACTS AND PROCEDURAL BACKGROUND

UPS operates a regional sorting hub in Louisville, Kentucky. UPS routes outbound international packages through the Louisville hub, where employees sort packages by country of destination. At these hubs, used by express consignment services like UPS or FedEx, the federal government stations Customs officers to inspect outbound international packages that pass through these hubs. Customs officers open and inspect packages, selected at random, to determine whether they contain prohibited articles or contraband. After Customs officers finish their inspections, UPS employees place the packages into sealed containers and load the containers onto airplanes. The airplanes may depart for foreign airports or first fly to another domestic hub before leaving the United States.

On September 30, 2003, as part of an outbound interdiction operation, Customs Officer Christopher Crace opened a randomly selected package sent by Abbouchi from Diamond Bar, California, and addressed to someone in Lebanon. Inside the package was a sealed envelope containing two social security cards and two permanent resident alien cards. Crace also found a photocopy of a permanent resident alien card, handwritten notes, and an identification booklet written in Arabic. Crace notified his superior, and they determined that the package may contain fraudulent immigration documents. They forwarded the package to the Immigration and Customs Enforcement ("ICE") office in Louisville for further investigation.

The Louisville ICE office forwarded the package to the Los Angeles ICE office on October 24, 2003. ICE Senior Special Agent Christopher Laska used the UPS airbill to trace the origin of the package to the UPS Store in Diamond Bar, California. The store's owner identified Abbouchi as the package's sender.

On January 21, 2004, Agent Paul Yokoyama from the Office of the Inspector General for the Social Security Administration interviewed Abbouchi. Abbouchi signed a *Miranda* waiver and admitted mailing a UPS package to Lebanon. Abbouchi claimed the package contained his military booklet and some other personal documents. Initially, Abbouchi denied that he knowingly sent the social security and permanent residency cards. Further investigation produced evidence that Abbouchi had on other occasions sent to Lebanon fraudulent documents that the recipients could have used to enter the United States illegally.

On February 17, 2005, a grand jury returned an indictment charging Abbouchi with four counts of transferring false identification documents in violation of 18 U.S.C. § 1028(a)(2), and one count of making a false statement, in violation of 18 U.S.C. § 1001.

Before trial, Abbouchi filed a motion to suppress all evidence derived from the search of his UPS package. At a suppression hearing, Customs Officer Crace testified to Customs inspection practices at regional sorting hubs. District Judge Percy Anderson denied the motion to suppress.

The prosecution dropped the § 1001 false statement charge. At the end of the government's case-in-chief, Abbouchi moved for a partial judgment of acquittal on the counts relating to the social security documents. The district court denied the motion.

On September 29, 2005, the jury found Abbouchi guilty on the four counts of transferring false identification documents. The district court sentenced Abbouchi to sixteen months imprisonment followed by three years of supervised release. Among other things, the supervised release conditions required Abbouchi to enter a domestic violence treatment program. The conditions also required Abbouchi to report to his probation officer within seventy-two hours of reentering the country, and required Abbouchi to "answer truthfully all inquiries by the probation officer. . . ." Abbouchi then brought this appeal.

## II.  MOTION TO SUPPRESS

We begin our analysis by addressing Abbouchi's primary contention that the government violated his Fourth Amendment rights because the Customs officers lacked sufficient predicate, i.e., reasonable suspicion, to open and search his UPS package. Abbouchi argues that the search of his UPS package did not occur at the functional equivalent of the border, but was an "extended" border search that required reasonable suspicion. We disagree.[1]

---

[1]A district court's ruling on the legality of a border search is reviewed de novo. *United States v. Ani*, 138 F.3d 390, 391 (9th Cir. 1998). A district court's findings of fact are reviewed for clear error. *United States v. Mendoza-Ortiz*, 262 F.3d 882, 885 (9th Cir. 2001).

**[1]** The border search doctrine is a narrow exception to the Fourth Amendment's usual requirement that searches be supported by a warrant approved by a magistrate and issued upon a showing of probable cause. *United States v. Sutter*, 340 F.3d 1022, 1025 (9th Cir. 2003). Border searches are grounded on the government's right to protect the United States' territorial integrity by examining persons and property entering and leaving the country, and "are reasonable simply by virtue of the fact that they occur at the border." *United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004) (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977)); *see also United States v. Cortez-Rocha*, 394 F.3d 1115, 1118-19, 1123 (9th Cir. 2005). As a consequence, most searches at the international border need not be justified by a search warrant or by individualized suspicion. *See Sutter*, 340 F.3d at 1025. The border search doctrine applies equally to searches of persons and property exiting the United States as to those entering the country. *See United States v. Cardona*, 769 F.2d 625, 629 (9th Cir. 1985) (explaining that "the border search exception applies to exit searches").

**[2]** Despite its name, a border search need not take place at the actual international border. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 272-73 (1973). These searches may take place at the physical border or its "functional equivalent." *Id.; see also Duncan,* 693 F.2d at 977. This extension of the border search doctrine reflects "[t]he practical difficulty of getting to and searching every vehicle or carrier at the precise moment it crosses land or sea borders." *United States v. Alfonso*, 759 F.2d 728, 734 (9th Cir. 1985).

**[3]** We have also recognized another category of border search: the extended border search. Extended border searches are typically separated from the border by "a greater spatial and temporal distance" from the actual border than searches at the functional equivalent of the border. *Cardona*, 769 F.2d at 628. Because "the delayed nature of an extended border search . . . necessarily entails a greater level of intrusion on

legitimate expectations of privacy than an ordinary border search," the government must justify an extended border search with reasonable suspicion that the search may uncover contraband or evidence of criminal activity. *See United States v. Caicedo-Guarnizo*, 723 F.2d 1420, 1422 (9th Cir. 1984)

**[4]** We have recognized that comparison of absolute time and spatial differences alone is not enough to distinguish between a search at the border's functional equivalent and an extended border search. Rather, we also look to whether the search, as was true of Abbouchi's package, occurred at the last practicable opportunity before its passage over the international border. Thus, in *Almeida-Sanchez*, the Supreme Court noted that "a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City" would be at the functional equivalent of the border. *See* 413 U.S. at 273. Similarly, in *Duncan*, we held it would be "unreasonable" to require federal agents to wait until a suspect boards his airplane to conduct a search. *See* 693 F.2d at 977. Rather, it was enough that the defendant had checked his luggage, obtained his boarding pass, passed through security, and embarked on the ramp to his flight because these acts "manifest[ed] a definite commitment to leave the United States," and the search occurred "in reasonable temporal and spatial proximity to the departure." *See id.*

**[5]** Applying these principles, we hold that the search of Abbouchi's UPS package at the Louisville hub took place at the functional equivalent of the border. The Louisville sorting hub represents the last practicable opportunity for Customs officers to inspect international packages before UPS places them into sealed containers for departure from the United States. Even if the airplanes briefly stop at another hub or airport to refuel or redistribute cargo before departing our country, it is unreasonable to require customs officials to wait until that last domestic stop to unload the packages from the airplane, reopen the sealed containers, and conduct an inspection before allowing the airplane to proceed to its international

destination. *See id.* Certainly, the search at the Louisville hub represents no greater intrusion on Abbouchi's privacy interests than a search at the last possible moment before the package's departure from the United States.[2]

Finally, Abbouchi argues that under *Cardona*, the potential length of time between a package's inspection at the Louisville hub and its departure from the United States rendered it an extended border search. *Cardona,* however, is inapposite. In that case, federal agents opened two FedEx packages shortly after being placed on a truck for delivery, and long before they arrived at a regional hub. *Cardona*, 769 F.2d at 627. It was only in that context that we held the 3,000 mile distance and 24-hour time interval separating the search from the packages' passage over the international border compelled us to treat it as an extended border search. *See id.* at 628-29. By contrast, we deal here with a search at the last practicable opportunity for inspection.

**[6]** In sum, we hold that Customs officers at the Louisville UPS hub did not need reasonable suspicion to search the contents of Abbouchi's UPS package because the search took place at the functional equivalent of the border.[3] Conse-

---

[2]Abbouchi argues that the government failed to develop the factual record sufficiently to establish that this search took place at the functional equivalent of the border. We disagree. Officer Crace's testimony about Customs practices at regional sorting hubs sufficed to establish that these are the last *practicable* places where customs inspections may take place. Even if further evidence had shown that the UPS airplane might also land at another airport, there is simply no reason to believe that Customs would inspect the airplane's cargo a second time, or that it would be reasonable to expect Customs to do so.

[3]Abbouchi also contends that customs inspectors lacked statutory authority to conduct the search. This argument lacks merit. Customs inspectors had statutory authority to conduct these border searches under 31 U.S.C. § 5317, a statute authorizing inspections to enforce a statute prohibiting transport of undeclared high-value monetary instruments across the border, *see United States v. Gomez-Osorio*, 957 F.2d 636, 643

quently, the district court's denial of the motion to suppress is affirmed.

### III. MOTION FOR ACQUITTAL

Abbouchi next contends that he is entitled to acquittal as a matter of law on the two counts predicated on his transfer of fraudulent social security cards. He argues that social security cards are not "identification documents" within the meaning of 18 U.S.C. § 1028(a)(2). We disagree.[4]

**[7]** Section 1028(a)(2) provides criminal penalties for anyone who "knowingly transfers an identification document . . . or a false identification document knowing that such document . . . was stolen or produced without lawful authority." 18 U.S.C. § 1028(a)(2). An "identification document" includes documents "made or issued by or under the authority of the United States Government . . . which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals." 18 U.S.C. § 1028(d)(3).

---

(9th Cir. 1992), as well as under 19 U.S.C. § 1582, the general source of Customs's border search authority, *cf. United States v. Taghizadeh*, 41 F.3d 1263, 1266 (9th Cir. 1994) (en banc) (holding that § 1582 border search authority for "persons and baggage" extends to international mail). Customs also had inspection authority under 19 U.S.C. § 1581(a), which authorizes searches of any person, trunk, package, or cargo loaded onto a vessel or into a vehicle. It does not matter under which statute Customs officers believed they were operating. *See Whren v. United States*, 517 U.S. 806, 813 (1996).

[4]At the close of the government's case-in-chief, the district court, acting on the defendant's motion, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. A district court's denial of a Rule 29 motion is reviewed de novo. *United States v. Johnson,* 357 F.3d 980, 983 (9th Cir. 2004). We review the evidence in the light most favorable to the government and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir. 2002)).

**[8]** In *United States v. Quinteros*, 769 F.2d 968 (4th Cir. 1985), the Fourth Circuit acknowledged that Congress did not initially intend that social security cards be used for identification. 769 F.2d at 970. Nevertheless, the Fourth Circuit accepted the testimony of a Social Security Administration expert that social security cards are commonly accepted as identification. *Id.* Indeed, the expert for the Social Security Administration testified that the Administration issues cards to senior citizens for use as identification for cashing checks, and that the Administration removed the "Not for Identification Purposes" legend from these cards in 1972 to reflect their emerging use as a form of identification. *Id.* The Fourth Circuit also cited legislative history for § 1028(a)(2) suggesting that Congress contemplated the statute would cover social security cards.[5] *See id.*

**[9]** We find the Fourth Circuit's reasoning persuasive. Therefore, we hold that Social Security Administration Agent Paul Yokoyama's expert testimony in the instant case that social security cards are commonly used for identification was sufficient to establish this element of § 1028(a)(2). Accordingly, we affirm the district court's denial of Abbouchi's motion for acquittal on the two counts of transferring fraudulent social security identification cards.

## IV. SUPERVISED RELEASE CONDITIONS

Abbouchi challenges several aspects of his supervised release conditions. We remand for the limited purpose of resentencing Abbouchi after the district court has the opportunity to reconsider its imposition of the domestic violence treatment condition and its associated payment condition.

---

[5]Congress has since amended § 1028(d)(3). *See* USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. 109-177 § 603(3), 120 Stat. 192, 253 (2006). Because the amendment came after Abbouchi committed his offense, it is irrelevant to this appeal.

## A. Domestic Violence Treatment Condition

Abbouchi first challenges the supervised release condition requiring him to participate in a domestic violence treatment program. Because Abbouchi did not object to this condition in the district court, we review for plain error. Fed. R. Crim. P. 52(b); *United States v. Jordan*, 256 F.3d 922, 926 (9th Cir. 2001). The existence of plain error requires "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to [reverse for plain error], but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)).

[10] Supervised release conditions must be reasonably related to the state's interest in promoting deterrence, public protection, and rehabilitation of the offender. 18 U.S.C. § 3583(d)(1); *United States v. T.M.*, 330 F.3d 1235, 1239-40 (9th Cir. 2003). The conditions must also "involve[ ] no greater deprivation of liberty than is reasonably necessary for the purposes [of deterrence, public protection, and rehabilitation]." 18 U.S.C. § 3583(d)(2). The conditions must also be consistent with the Sentencing Commission's policies. 18 U.S.C. § 3583(d)(3). The justification for imposition of a non-standard probation condition must be supported by the record. *See United States v. Napier*, 463 F.3d 1040, 1044-45 (9th Cir. 2006).

[11] We find plain error. The only evidence considered by the district court to support the domestic violence condition was a paragraph in the Presentence Report suggesting "strains" in Abbouchi's relationship with his wife and that he and his wife had separated. This evidence is insufficient to support imposition of the domestic violence treatment condition. *Cf. Napier*, 463 at 1045 (holding that convictions that were twenty-years old for selling cocaine and some evidence of unusual behavior did not support imposition of a substance

abuse treatment condition as part of the sentence for a fraud conviction). Imposition of the condition requiring domestic violence treatment affected Abbouchi's substantial rights. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (holding that in most cases, error affects substantial rights when it "affect[s] the outcome of the district court proceedings"). Finally, considering the paucity of the evidence in the record to support the domestic violence treatment condition, we conclude that erroneous imposition of that condition "seriously affect[ed] the fairness . . . of [the] judicial proceedings." *See Jordan*, 256 F.3d at 926 (quoting *Johnson*, 520 U.S. at 466-67).

Because Abbouchi did not object to the imposition of a domestic violence treatment condition before the district court, the district court did not need to resolve Abbouchi's factual challenges to the presentence report. *See* Fed. R. Crim. P. 32(i)(3)(B) (district court need not resolve disputed matters that will not affect sentencing). Therefore, the district court declined to resolve Abbouchi's objections to paragraphs sixty through seventy of the presentence report, which provided examples of Abbouchi's alleged physical and emotional abuse of his wife. Given the lack of objection to the domestic violence treatment condition and the seriousness of the allegations of spousal abuse, we vacate Abbouchi's sentence and remand to the district court for the limited purpose of resentencing Abbouchi after the district court has had the opportunity to reconsider the imposition of Abbouchi's domestic violence treatment condition and its associated payment condition. *See, e.g., United States v. Doe*, 488 F.3d 1154, 1163 (9th Cir. 2007) (issuing a limited remand to the district court with instructions that the district court give advance notice of any nonstandard conditions of supervised release and that the defendant be allowed to object to the imposition of any of those conditions where the district court erroneously imposed certain supervised release conditions without notice); *United States v. Decoud*, 456 F.3d 996, 1022 (9th Cir. 2006) (issuing a limited remand to allow the district court the opportunity to

reconsider the imposition of an un-objected to supervised release term); *see also United States v. Matthews*, 278 F.3d 880, 885 (9th Cir. 2002) (en banc) ("[A]s a general matter, if a district court errs in sentencing, we will remand for resentencing on an open record — that is, without limitation on the evidence that the district court may consider.").[6]

## B.   Reporting Requirement

**[12]** Abbouchi also claims that the requirement that he report to a probation officer within seventy-two hours of reentry into the United States and that he truthfully answer any questions asked of him by the probation officer violates his Fifth Amendment right against self-incrimination. His challenge to the seventy-two hour reporting requirement itself is foreclosed by *United States v. Rodriguez-Rodriguez*, 441 F.3d 767, 772-73 (9th Cir. 2006) (holding that a requirement that the defendant report to the probation office upon reentering the country does not require the defendant to incriminate himself). Furthermore, it is premature to decide Abbouchi's challenge to the requirement that he answer truthfully any questions asked of him by the probation officer. Nothing prevents Abbouchi from raising a Fifth Amendment issue should it arise. *See id.* (holding that the defendant could assert his Fifth Amendment privilege if asked a question that would tend to incriminate him). We affirm the district court's remaining supervised release conditions.

## V.   CONCLUSION

The search of Abbouchi's UPS package at the Louisville UPS hub took place at the functional equivalent of the border because it was the last practicable opportunity for Customs

---

[6]Although the condition in the written judgment requires Abbouchi to pay for treatment of "the defendant's psychiatric disorder," the sentencing transcript makes clear that the sentence as orally pronounced links the payment condition to domestic violence treatment.

officers to conduct an inspection before Abbouchi's package departed from the United States. Thus, the Customs officers did not need reasonable suspicion to open and inspect the contents of his randomly selected package intended for overseas delivery. We also hold that there was sufficient evidence to establish that social security cards are "identification documents" within the meaning of 18 U.S.C. § 1028(a)(2). We agree that the district court committed plain error by requiring Abbouchi to participate in a domestic violence treatment program while on supervised release. Accordingly, we affirm the convictions but vacate the sentence. We remand for the limited purpose of resentencing Abbouchi after the district court has had the opportunity to reconsider the imposition of Abbouchi's domestic violence treatment condition and its associated payment condition.

**AFFIRMED in PART, VACATED in PART, and REMANDED.**