**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

v.

HOWARD WESLEY COTTERMAN,
            *Defendant-Appellee.*

No. 09-10139

D.C. No.
4:07-cr-01207-RCC-
CRP-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, District Judge, Presiding

Argued and Submitted
September 9, 2010—San Francisco, California

Filed March 30, 2011

Before: Betty B. Fletcher, Richard C. Tallman, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Tallman;
Dissent by Judge B. Fletcher

## COUNSEL

John J. Tuchi, United States Attorney, District of Arizona, Christina M. Cabanillas, Appellate Chief, Carmen F. Corbin (argued), Assistant United States Attorney, Tucson, Arizona, for plaintiff-appellant United States of America.

William J. Kirchner (argued), Walter Nash, Law Offices of Nash & Kirchner, P.C., Tucson, Arizona, for defendant-appellee Howard Wesley Cotterman.

## OPINION

TALLMAN, Circuit Judge:

Today we examine a question of first impression in the Ninth Circuit: whether the search of a laptop computer that begins at the border and ends two days later in a Government forensic computer laboratory almost 170 miles away can still fall within the border search doctrine. The district court considered the issue to be a simple matter of time and space. It concluded that the search of property seized at an international border and moved 170 miles from that border for further search cannot be justified by the border search doctrine. We disagree.

We find no basis under the law to distinguish the border search power merely because logic and practicality may require some property presented for entry—and not yet admitted or released from the sovereign's control—to be transported to a secondary site for adequate inspection. The border search doctrine is not so rigid as to require the United States to equip every entry point—no matter how desolate or infrequently traveled—with inspectors and sophisticated forensic equipment capable of searching whatever property an individual may wish to bring within our borders or be otherwise precluded from exercising its right to protect our nation absent some heightened suspicion.

Still, the line we draw stops far short of "anything goes" at the border. The Government cannot simply seize property under its border search power and hold it for weeks, months, or years on a whim. Rather, we continue to scrutinize searches and seizures effectuated under the longstanding border search power on a case-by-case basis to determine whether the manner of the search and seizure was so egregious as to render it unreasonable.

Because we agree with the district court's conclusion that the federal agents acted reasonably, and find that neither the scope of the intrusion nor the duration of the deprivation was egregious, we reverse the district court's order suppressing hundreds of images and videos of child pornography found on Howard Cotterman's computer and remand the case to the district court for further proceedings consistent with our decision.

## I

### A

On Friday, April 6, 2007, at approximately 10 a.m., Howard and Maureen Cotterman drove from Mexico to the Lukeville, Arizona, Port of Entry ("POE") and presented

themselves for admission into the United States with valid United States passports. Following protocol, the inspector checked both passports against the Customs and Border Protection ("CBP") electronic database and discovered a Treasury Enforcement Communication System ("TECS") alert on Cotterman's[1] name. The TECS alert—placed in the computer system by Immigration and Customs Enforcement ("ICE") agents in Long Beach, California, after Cotterman was convicted in 1992 for two counts of use of a minor in sexual conduct, two counts of lewd and lascivious conduct upon a child, and three counts of child molestation—informed the officer to be on the "lookout" for child pornography.[2] Because of the alert, the inspector sent the Cottermans to a secondary inspection area for a more thorough search, as authorized by statute and regulation. *See* 19 U.S.C. §§ 1433, 1582.[3]

The Lukeville CBP officer assigned to secondary inspection called the Long Beach contact number listed on the

---

[1]All references to "Cotterman" in this opinion refer to Howard Cotterman. We will refer to his wife simply by her first name of Maureen.

[2]The TECS entry was part of Operation Angel Watch, which combats child sex tourism by flagging sex offenders who target children and frequently travel outside the United States. Cotterman is a registered sex offender in California.

[3]Vehicles entering the United States may do so "only at border crossing points designated by the Secretary" of the Treasury, and, "immediately upon the arrival of any vehicle in the United States at a border crossing point, the person in charge of the vehicle shall (A) report the arrival; and (B) present the vehicle, and all persons and merchandise (including baggage) on board, for inspection to the customs officer at the customs facility designated for that crossing point." 19 U.S.C. § 1433(b). Furthermore, "all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government," and the Secretary of the Treasury is authorized to "prescribe regulations for the search of persons and baggage" at our nation's borders. *Id.* § 1582. We recognize that the creation of the Department of Homeland Security has resulted in the transfer of these responsibilities to the newly created United States Customs and Border Protection component. That reorganization is immaterial to the resolution of this case.

TECS alert and spoke with an agent from the ICE Pacific Field Intelligence Office. The ICE agent told him to search anything that could contain evidence of child pornography or sex with children. During the vehicle search, CBP officers found two laptop computers and three digital cameras. Officer Antonio Alvarado was tasked with inspecting the laptops and cameras while other officers continued searching the vehicle. Officer Alvarado did not find any child pornography on the equipment. His inspection was limited, however, by the fact that many of Cotterman's files were password protected.

At approximately 12:00 or 12:30 p.m., Group Supervisor Craig Brisbine at the ICE office in Sells, Arizona, was notified about Cotterman. Agent Brisbine and the Sells Duty Agent, Mina Riley, responded from Sells at approximately 1:30 p.m. and arrived at the Lukeville POE at 3:00 or 3:30 p.m. Agent Riley testified that she and Agent Brisbine decided while en route that they would detain the Cottermans' laptops for forensic examination.

Upon arrival, Agents Brisbine and Riley administered *Miranda* warnings to Cotterman and Maureen and interviewed them separately. Nothing incriminating was said during the interviews. Cotterman offered to help the agents with his computer, but the agents declined to allow him access to any of the electronic equipment. Agent Riley testified that she did not allow Cotterman to touch the laptops because she was not trained in computer forensics and was concerned that (1) files could be deleted by Cotterman without her knowledge, (2) the laptops might be "booby trapped," or (3) there might be files she would be unable to see even with full access to the laptops.

At approximately 6:00 p.m., Agents Brisbine and Riley left the Lukeville POE with both laptops and one of the three digital cameras. The other two cameras were returned to the Cottermans, who were told that the laptops and camera were being taken to Tucson for further examination. The agents

told the Cottermans that the examination would ideally be completed prior to the Cottermans' scheduled departure from Tucson.[4] Soon after the ICE agents departed, the Cottermans were also permitted to leave the POE.

Agent Brisbine delivered the detained laptops and camera to ICE Senior Special Agent & Computer Forensic Examiner John Owen at the ICE office in Tucson at approximately 11:00 p.m. on April 6, 2007. The following morning, Agent Owen used forensic computer software to make copies ("mirror images") of the three laptop hard drives—one hard drive in Maureen's computer and two drives in Cotterman's— and the digital memory card from the digital camera. Agent Owen first examined the digital data copied from the camera and determined that it did not contain any contraband. He released the camera to Cotterman in Tucson that same day. Next, Agent Owen used his forensic software to examine the data copied from the laptop hard drives. Agent Owen testified that the forensic scripts and procedures he utilizes to examine mirror images for contraband generally take several hours to run, so he often leaves them running overnight and examines the results the following morning.

On Sunday, Agent Owen began his personal examination of what he believed was Cotterman's laptop. He later became aware that he actually started with Maureen's laptop because it had been placed in Cotterman's laptop bag. He did not find any contraband on that laptop. He then began examining the second laptop. That evening, he discovered approximately seventy-five images of child pornography within the laptop's unallocated space.[5]

---

[4]At some point during the interviews the Cottermans had told the officers that they were planning to stay in Tucson for a few days before returning home to California.

[5]Unallocated space is space on the hard drive where a computer stores digital information that has been erased by the computer user or information from web sites the computer user has visited, enabling the web site to load more quickly the next time the site is visited.

Agent Owen called the Cottermans, who were still in Tucson, to inform them that they could pick up Maureen's laptop on Monday morning. He told Cotterman that he needed Cotterman's help to access the password-protected files on his laptop before it could be released. Cotterman agreed to provide the requested assistance the next day.

Maureen arrived at the Tucson ICE offices at 9:00 a.m. on Monday, April 9, 2007, to pick up her laptop. She told the ICE agents that Cotterman had business to take care of in Tucson and was unable to come in. Agent Brisbine spoke with Cotterman on the phone and again asked for the passwords to the laptop files. Cotterman then claimed that the computer had multiple users and he would have to contact his business partners to obtain the passwords. Maureen waited at the ICE office for more than two hours, ostensibly waiting for Cotterman to call with passwords so ICE could clear his computer and thereby permit her to collect his laptop as well as her own. When he did not call by 11:30 a.m., she left with only her computer.

On April 10, 2007, the ICE Pacific Field Intelligence Unit notified Agent Riley that Cotterman had boarded a flight to Mexico from Tucson at 12:15 p.m. on April 9. His final destination was Sydney, Australia. On April 11, 2007, Agent Owen was finally able to bypass Cotterman's computer security and open twenty-three of the password-protected files. He discovered approximately 378 images of child pornography—360 of which appeared to be images of the same seven- to ten-year-old girl over a two- to three-year period. Many of the images show Cotterman sexually molesting the child. Hundreds more pornographic images, stories, and videos depicting children were discovered on the laptop hard drive by Agent Owen over the next few months. Based on comparisons of the physical features of the subjects shown in various images on Cotterman's laptop, ICE agents were able to iden-

tify both Cotterman as the molester and the young female victim, who was then located and interviewed.[6]

**B**

Cotterman was indicted in the District of Arizona on June 27, 2007, for production of child pornography, transportation and shipping of child pornography, receipt of child pornography, possession of child pornography, importation of obscene material, transportation of obscene material, and unlawful flight to avoid prosecution. After he was charged, Cotterman was arrested by Australian law enforcement and was extradited back to Arizona. He was subsequently turned over to the United States Marshals Service on March 31, 2008, and ordered detained pending trial.

On April 18, 2008, Cotterman moved to suppress the evidence discovered on his laptop and any "fruits" of that evidence. Magistrate Judge Charles Pyle held a suppression hearing on August 27, 2008, and heard testimony from Agent Riley, Agent Owen, Officer Alvarado, and Group Supervisor Brisbine. On September 12, 2008, Judge Pyle filed a Report & Recommendation urging that the motion to suppress be granted in full and that the Government be required to return the copies it had retained of Maureen's laptop hard drive and the Cottermans' personal papers. He reasoned that the actual search of the laptop occurred two days after Cotterman's entry into the United States and 170 miles from the border, so it had to have been an extended border search requiring reasonably particularized suspicion. Judge Pyle further determined that the ICE agents did not have reasonable suspicion that evidence of criminal activity would be found on the laptop and, therefore, the search was performed in violation of the Fourth Amendment.

---

[6]We do not identify the victim here so as to protect her privacy.

District Judge Raner Collins adopted the Report & Recommendation on February 23, 2009. Judge Collins also made several factual findings, including two that are particularly relevant to the lone issue raised on appeal: that the search of the laptop could have been conducted at the border and that it took at least forty-eight hours to yield results.

The Government filed this interlocutory appeal on March 19, 2009. We have jurisdiction pursuant to 18 U.S.C. § 3731.

## II

"A district court's ruling on the legality of a border search is reviewed de novo." *United States v. Seljan*, 547 F.3d 993, 999 n.6 (9th Cir. 2008) (en banc) (citing *United States v. Ani*, 138 F.3d 390, 391 (9th Cir. 1998)), *cert. denied*, 129 S. Ct. 1368 (2009). "A district court's findings of fact are reviewed for clear error." *Id.* (citing *United States v. Mendoza-Ortiz*, 262 F.3d 882, 885 (9th Cir. 2001)). A finding of fact is clearly erroneous if it is illogical, implausible, or without support in the record. *United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 577 (1985)).

## III

On appeal, the United States does not contest the district court's determination that there was insufficient evidence to establish reasonable particularized suspicion of criminal activity[7] to support the search under the extended border search doc-

---

[7]We do not take issue with the decision of the United States given the record before us. Specifically, the district court made a factual finding that only two facts supported reasonable suspicion: Cotterman was a convicted sex offender on a watch list, and he had password-protected files on his computer. Notably, the court additionally found, however, that whatever abstract suspicious character these facts conveyed, that character was entirely mitigated by the circumstances of this particular case.

trine.[8] Rather, the United States contends that it did not need to demonstrate reasonable suspicion because the border search doctrine justified both its initial search and its decision to transport Cotterman's computer away from the border to adequately complete its search. As a result, the narrow issues before us are simply whether the border search doctrine applied and, if it did, whether the Government's conduct was so egregious as to render the search unreasonable.

---

First, agents spent almost two hours searching Cotterman's car and electronic equipment and found nothing even remotely suspicious other than password protected files. Rather, they found only photos of a family vacation—evidence that would tend to negate a reasonable officer's suspicion.

Second, the court concluded that the presence of password-protected files is not itself suspicious, noting that even the border patrol agent who searched the laptops testified that the use of password protection is commonplace and can be for either legitimate or nefarious purposes. In that regard, the court noted that the ICE agents had determined that they would take both laptops for forensic evaluation before they had even left Sells for Lukeville—a finding that renders any fact other than Cotterman's TECS hit practically irrelevant—and also seized the laptop of Maureen Cotterman, even though it did not contain any password-protected files.

Finally, the district court concluded that the customs officers "acted so presumptively, without even considering whether they had reasonable suspicion," because of their reliance on ICE field guidelines and an official memorandum "that make[ ] clear that electronic media may be seized at the border without any individualized suspicion." Thus, the district court made a factual finding that none of the other circumstances were even considered; the agents decided to take the equipment because they were told they could absent suspicion.

[8]An extended border search is a "search away from the border *where entry is not apparent*, but where the dual requirements of reasonable certainty of a recent border crossing and reasonable suspicion of criminal activity are satisfied." *United States v. Guzman-Padilla*, 573 F.3d 865, 878-79 (9th Cir. 2009) (internal quotation marks and citations omitted) (emphasis added), *cert. denied*, 131 S. Ct. 67 (2010), *and Vasquez-Rosales v. United States*, 130 S. Ct. 1552 (2010).

**A**

We need not dwell long on the general scope of the Government's border search power. It is well-established that the sovereign need not make any special showing to justify its search of persons and property at the international border. *United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004) ("Time and again, [the Supreme Court] ha[s] stated that searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *(quoting United States v. Ramsey*, 431 U.S. 606, 616 (1977))); *Seljan*, 547 F.3d at 999-1000. Rather, it is the traveler who must demonstrate he is entitled to cross our borders and to bring with him whatever he may wish to carry. *Carroll v. United States*, 267 U.S. 132, 154 (1925) ("Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself *as entitled to come in*, and his belongings as effects which may be lawfully brought in." (emphasis added)); *Torres v. Puerto Rico*, 442 U.S. 465, 472-73 (1979) ("By reason of the [United States' inherent sovereign authority to protect its territorial integrity], it is entitled to require that whoever seeks entry *must establish* the right to enter and to bring into the country whatever he may carry." (emphasis added)).

Neither is there room for disagreement over the compelling underpinnings of the doctrine. Its foundation is rooted in the Government's paramount interest in protecting our country from people and property it does not desire within our borders. *E.g.*, *Flores-Montano*, 541 U.S. at 152-53 ("The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border. . . . It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity."); *see also United States v.*

*Arnold*, 533 F.3d 1003, 1007 (9th Cir. 2008) (quoting *Torres*, 442 U.S. at 472-73), *cert. denied*, 129 S. Ct. 1312 (2009).

[1] Thus, there is no legitimate question as to whether the border search doctrine justified the initial detention of Cotterman and his property.[9] Cotterman himself concedes, albeit reluctantly, that had the Government elected to transport its personnel and specialized computer forensic equipment to the border to perform its search, the border search doctrine likewise would have applied. The sticking point is whether the inherent power of the Government to subject incoming travelers to inspection before entry also permits the Government to transport property not yet cleared for entry away from the bor-

---

[9]As a preliminary matter, we readily dispense with Cotterman's claim—and the first of three principal arguments relied upon by the dissent—that the Government may search property at the border, but is powerless to seize property to adequately conduct its search absent some particularized suspicion. Quite to the contrary, we note that the Supreme Court has explicitly recognized that the Government possesses inherent authority to seize property at the international border without suspicion: "Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches *and seizures* at the border, *without probable cause or a warrant*, in order to regulate the collection of duties and *to prevent the introduction of contraband into this country*." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985) (citing *Ramsey*, 431 U.S. at 616-17) (emphasis added); *see also Flores-Montano*, 541 U.S. at 152, 154 n.2, 156 (holding that property deprivations at the border remain "routine" regardless of the "degree of intrusiveness" of the search); *id.* at 155 ("While the interference with a motorist's *possessory interest* is not insignificant when the Government removes, disassembles, and reassembles his gas tank, it nevertheless is justified by the Government's paramount interest in protecting the border." (emphasis added)).

This same fundamental proposition—that the very act of seeking entry across our borders triggers the sovereign right to search and seize, *e.g.*, *Montoya de Hernandez*, 473 U.S. at 537; *Torres*, 442 U.S. at 472-73—likewise refutes the dissent's penultimate argument, *Dissenting Opinion* at 4238, by directly answering the question: "what circumstances justify the seizure and search." Because we recognize and adhere to these settled and inescapable principles, we examine the seizure of Cotterman's computer only to determine whether the duration of the deprivation was egregious.

der to complete its search. Cotterman claims that it does not. We cannot agree.

**[2]** The flaw in Cotterman's claim, and the district court's conclusion, is that each relies on the simple physical act of moving beyond the border—a "comparison of absolute time and spatial differences alone"—to distinguish the border search doctrine. *United States v. Abbouchi*, 502 F.3d 850, 855 (9th Cir. 2007), *cert denied*, 552 U.S. 1238 (2008). In light of our jurisprudence, this analysis is far too rigid and simplistic. *See id.* "Despite its name, a border search need not take place at the actual international border." *Id.* ("[Border] searches may take place at the physical border or its 'functional equivalent.' "). Rather, the border search doctrine applies to searches and seizures that occur hundreds or thousands of miles from the physical border. *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) ("[A] search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search."); *Seljan*, 547 F.3d at 996 (holding that a search of packages at a FedEx sorting facility was a permissible border search). In *Abbouchi*, for example, we held that the border search doctrine permitted the suspicionless search and seizure of packages at a UPS sorting facility in Louisville, Kentucky—a location that sits much farther than 170 miles from the nearest border. 502 F.3d at 853, 856.

In addition, while permitting searches at those great distances, we have declined to apply the doctrine to some searches that occur within a few miles of the border. *See, e.g.*, *United States v. Villasenor*, 608 F.3d 467, 471-72 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 547 (2010). If the border search doctrine was constrained as simply as Cotterman contends, this disparate treatment would be quite arbitrary. Our jurisprudence makes perfect sense, however, when one considers that the border search doctrine is guided—like all Fourth Amendment jurisprudence—by reason and practical-

ity, not inflexible rules of time and space. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985).

The touchstone for particularized suspicion is therefore not simply the occurrence of a search or seizure at a location other than at the border; rather, it is the greater Fourth Amendment intrusion that occurs when an individual is detained and searched at a *location beyond the border where he had a normal expectation of privacy in the object searched. Villasenor*, 608 F.3d at 471-72; *Abbouchi*, 502 F.3d at 855 ("Because the delayed nature of an extended border search . . . necessarily entails a greater level of intrusion on legitimate expectations of privacy than an ordinary border search, the [G]overnment must justify an extended border search with reasonable suspicion that the search may uncover contraband or evidence of criminal activity." (internal quotation marks omitted)); *United States v. Alfonso*, 759 F.2d 728, 734 (9th Cir. 1985).

**[3]** Time and space are only relevant to this initial inquiry to the extent that they inform us whether an individual would reasonably expect to be stopped and searched at a geographic point beyond the international border. *See, e.g.*, *Alfonso*, 759 F.2d at 734. In that regard, Cotterman's claim is quite different from each of the cases in which we required the Government to demonstrate reasonable suspicion. *Cf. Villasenor*, 608 F.3d at 472 (stop and search began after the suspect and his property had crossed the border); *Guzman-Padilla*, 573 F.3d at 874-75 (same); *Alfonso*, 759 F.2d at 736-37 (same). Unlike the defendants in those cases, Cotterman's detention and initial search occurred at the border itself—a point at which travelers do not have a normal expectation of privacy, but rather must expect to have their privacy intruded upon. *Montoya de Hernandez*, 473 U.S. at 537 ("Executive [has] plenary authority to conduct routine searches and seizures at the border"); *United States v. Ross*, 456 U.S. 798, 823 (1982) ("The luggage carried by a traveler entering the country may be searched at random by a customs officer . . . no matter how

great the traveler's desire to conceal the contents may be."); *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971) ("But a port of entry is not a traveler's home. His right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered during such a search."); *see also Flores-Montano*, 541 U.S. at 155 n.3 (no "Fourth Amendment right not to be subject to delay at the international border").

**[4]** Unlike *Villasenor*, this is not a case where Customs cleared an individual and his property for entry into the United States and authorities later stopped and searched that individual again after he had crossed the border. *Cf.* 608 F.3d at 470-71. Rather, the Government made it abundantly clear to Cotterman that his computers and cameras were not cleared for entry into the United States and that it had retained custody of that property until it could fully allay its concerns that they contained contraband. As a result, he never regained his normal expectation of privacy in his computer because he could only reasonably expect that it would be searched to alleviate the self-protection concerns of the sovereign. He never breathed that deep sigh of relief that follows from the realization that he had faced all the rigors of inspection and that nothing more lingered to impede his travels. *See id.*; *also United States v. Espericueta Reyes*, 631 F.2d 616, 620 (9th Cir. 1980), ("Certainly there comes a point *after a border crossing where an individual's relationship with the border is so attenuated* that a search may not be justified as a border search." (internal quotation marks omitted) (emphasis added)).

Having stripped away the layers of what Cotterman's claim is not—and having distinguished all of our extended border search jurisprudence in the process—we reach the very heart of Cotterman's claim: that travelers somehow have a constitutionally protected expectation that their property will not be removed from the border for search and, therefore, the Government must either staff every POE with the equipment and

personnel needed to fully search all incoming property or otherwise be forced to blindly shut its eyes and hope for the best absent some particularized suspicion. We find this position simply untenable.[10] *See Montoya de Hernandez*, 473 U.S. at 543; *Torres*, 442 U.S. at 472-73; *Carroll*, 267 U.S. at 154.

**[5]** First, the Supreme Court has recognized that the thorough search of property under the border search power does not implicate an individual's privacy expectation—even if the individual cannot depart from the border without that property. *Flores-Montano*, 541 U.S. at 155 n.3 (refusing to credit the claim that there exists "some sort of Fourth Amendment right not to be subject to delay at the international border and that the need for the use of specialized labor . . . and the potential for even greater delay . . . are an invasion of that right"). Quite to the contrary, the Court has indicated that travelers should expect intrusions and delay in order to satisfy the Government's sovereign interest in protecting our borders from those who would wish to do us harm.[11] *See id.*; *cf. Ross*, 456 U.S. at 823; *Torres*, 442 U.S. at 472-73.

---

[10]We recognize that few legitimate travelers would appreciate being regularly delayed in order to allow the Government to adequately search his or her property. However, our role is to determine what is legal, not what is desirable. We leave to Congress or the Department of Homeland Security the decision to promulgate limits on the utilization of more complex searches through legislation or rulemaking and note that, subsequent to this search, CBP did promulgate procedures for searching electronic devices under its border search authority. Notably, these procedures provide some limits on the ability of CBP officers to search and seize electronic devices, including requiring that devices be searched in a traveler's presence whenever possible and limiting the maximum duration of a seizure of a device to five days absent extenuating circumstances. U.S. Customs and Border Protection Directive No. 3340-049 (effective Aug. 20, 2009).

[11]The dissent disagrees with this clear conclusion and cites *United States v. Place*, 462 U.S. 696, 708 (1983), for the proposition that "detention of luggage within the traveler's immediate possession . . . intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary." We recognize, however, that

Second, categorically requiring the Government to demonstrate a higher level of suspicion before it may transport property to conduct more thorough and efficient searches furthers no constitutional purpose. *Cf. Carroll*, 267 U.S. at 154 (establishing nearly a century ago that travelers must demonstrate that they and their effects are entitled to enter within our borders). To the contrary, it would only reward those individuals who, either because of the nature of their contraband or the sophistication of their criminal enterprise, hide their contraband more cleverly or would be inclined to seek entry at more vulnerable points less equipped to discover them. *See Ross*, 456 U.S. at 823; *Thirty-Seven Photographs*, 402 U.S. at 376. In other contexts, we have recognized that the complexity of some property, specifically computer equipment, often will require the Government to seize that property and relocate it to a secondary site in order to adequately conduct a meaningful search. *United States v. Hill*, 459 F.3d 966, 975 (9th Cir. 2006) (concluding that "computer technology may in theory justify blanket seizures" in order to allow police to practically conduct searches otherwise authorized by law). We see no basis for distinguishing that precedent because the property was initially seized at the border.

**[6]** In sum, we will not confuse a search authorized by the border search power with an extended border search simply because the property was removed from the border. *See Abbouchi*, 502 F.3d at 855 (cautioning against a "comparison of absolute time and spatial differences alone"). Cotterman did not have a reasonable expectation of privacy in his property when he presented it to customs officials for inspection at the border, *see Montoya de Hernandez*, 473 U.S. at 537

---

*Place*—decided not in the context of a border search but under run-of-the-mill domestic circumstances—stands only for the rather unremarkable proposition that individuals *within our borders* have a reasonable expectation of privacy in their possessions. *See* 462 U.S. at 699-701. We decline to confuse border searches with their domestic counterparts. *See Carroll*, 267 U.S. at 154; *cf. Flores-Montano*, 541 U.S. at 155 n.3.

("Executive [has] plenary authority to conduct routine searches and seizures at the border"); *Ross*, 456 U.S. at 823 ("luggage . . . may be searched at random"), and he did not gain one simply because the Government moved that property to a secondary site with the necessary forensic equipment to complete its search. *See Hill*, 459 F.3d at 975. We flatly reject the contention that the Government must categorically demonstrate reasonable suspicion to continue a search initiated at the border to a secondary site.[12] So long as property has not been officially cleared for entry into the United States and remains in the control of the Government, any further search is simply a continuation of the original border search—the entirety of which is justified by the Government's border search power.

**B**

**[7]** Our conclusion that the Government need not categorically demonstrate some heightened suspicion to transport property to a secondary site for inspection does not end our inquiry. We by no means suggest that the Government has carte blanche at the border to do as it pleases absent any regard for the Fourth Amendment. *See Seljan*, 547 F.3d at 1000. Rather, we continue to analyze the Government's conduct on a case-by-case basis to determine whether searches or seizures are effectuated in such a manner as to render them unreasonable.[13]

---

[12]We expressly limit our holding to seizures and searches of property as we recognize that individuals have a far different expectation of privacy in their persons than in their luggage. *Flores-Montano*, 541 U.S. at 152.

[13]Though we believe it clear from the opinion itself, we reject the dissent's claim that we are authorizing *indefinite deprivations*. The Court has left open, and therefore we address, whether a border search might be deemed unreasonable because of the manner *in which it was carried out*. *Flores-Montano*, 541 U.S. at 154 n.2. Adhering to the Court's mandate, we examine only whether the *actual* deprivation that took place in this case was within the limits the Supreme Court has drawn. We do not pretend to address whether our holding would remain the same should the cir-

Notably, the Supreme Court has specified that the manner in which even a border search is conducted may require the Government to demonstrate a heightened degree of suspicion, *see Arnold*, 533 F.3d at 1007-08, and that even an initially permissible seizure can become unreasonable "if it is prolonged beyond the time reasonably required to complete th[e] mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). We address each of these concerns in turn.

## 1

**[8]** The Supreme Court has recognized three types of searches in which more is required than simple application of the border search doctrine. First, the Government must have reasonable suspicion to conduct "highly intrusive searches of the person." *Flores-Montano*, 541 U.S. at 152; *see also Montoya de Hernandez*, 473 U.S. at 541. Second, the Court has recognized the possibility "that some searches of property are so destructive as to require" particularized suspicion. *Flores-Montano*, 541 U.S. at 155-56. Finally, the Court has left "open the question 'whether, and under what circumstances, a border search might be deemed "unreasonable" because of the particularly offensive manner in which it is carried out.' " *Id.* at 154 n.2 (quoting *Ramsey*, 431 U.S. at 618 n.13).

**[9]** In Cotterman's case, we quickly dispense with the first two categories. The Court has been careful to distinguish invasive searches of persons from those of a traveler's property, explicitly permitting *highly intrusive searches* of vehicles without suspicion. *Id.* at 152 ("[T]he reasons that might support a requirement of some level of suspicion in the case

cumstances before us be replaced with any one of a vast parade of imagined horribles. Such hypothetical jurisprudence simply has no place in our case-by-case analysis. *Id.*; *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

of highly intrusive searches of the person—dignity and privacy interests of the person being searched—simply do not carry over to vehicles. Complex balancing tests to determine what is a 'routine' search of a vehicle, as opposed to a more 'intrusive' search of a person, have no place in border searches of vehicles.").[14] Within this framework, we have specifically held that "reasonable suspicion is not needed for customs officials to search a laptop or other personal electronic storage devices at the border." *Arnold*, 533 F.3d at 1008. In addition, there is no claim that the search was destructive.

In regard to the third category, Cotterman raises two arguments that can fairly be construed as suggesting a "particularly offensive manner" claim. First, he contends that the time required for the Government to conduct its search was so extensive that it required some heightened degree of suspicion. As this claim is better construed as a challenge to the length of the Government's seizure rather than the manner of its search, we shall address it as such in the following section.

---

[14]Despite the Court's clear refutation of prior attempts to categorize "highly invasive" searches of property as "non-routine"—a characterization that would require the Government to demonstrate a degree of suspicion to justify its actions, the dissent faults us for not recognizing that the "highly invasive" nature of "computer forensic searches" renders them non-routine and therefore requires the Government to demonstrate particularized suspicion. *Compare Flores-Montano*, 541 U.S. at 152 (holding that the balancing analysis undertaken in *Montoya de Hernandez* and the resultant need for particularized suspicion do not apply to highly intrusive searches of property at the border), *with Dissenting Opinion* at 4234 ("I would hold that officers must have some level of particularized suspicion in order to conduct a search and seizure like the one at issue here . . . ."); *id.* at 4235-37 ("An exceptionally invasive search of property can constitute a search conducted in a particularly offensive manner."). We decline to repeat the mistake corrected in *Flores-Montano*. Even assuming the Court in *Ramsey*, 431 U.S. at 618 n.13, left open whether an exceptionally invasive search of property might constitute a particularly offensive search, *Flores-Montano* did not. 541 U.S. at 152, 154 n.2, 156 (holding that, while "a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it was carried out," the "degree of intrusiveness" of the search is immaterial to that inquiry).

Cotterman's second claim is that the Government's extended search was particularly offensive because it was unnecessary. He contends that the agents could have discovered the child pornography at the POE had they either conducted their search there or accepted his offer of assistance.

We do not credit Cotterman's claim that his offer of assistance was constitutionally relevant. We find no legal basis from which to conclude that the Government is bound to accept such offers, particularly when, as noted by Agent Riley, sophisticated computer users can hide files, booby-trap computers, and delete items and programs unbeknownst to agents. Furthermore, given his subsequent unlawful flight to avoid prosecution, we have substantial reason to doubt the efficacy of the aid he intended to render.

**[10]** As to the need to search the property at the POE, both Cotterman and the district court take pains to point out that in many of the recent computer border search cases, the contraband was found without the need to transport the property off-site. *See Arnold*, 533 F.3d at 1005; *United States v. Romm*, 455 F.3d 990, 994-95 (9th Cir. 2006); *United States v. Ickes*, 393 F.3d 501, 502-03 (4th Cir. 2005); *United States v. Roberts*, 274 F.3d 1007, 1010-11 (5th Cir. 2001). Though this may be true, we fail to see how those quick and easy discoveries somehow translate into a requirement that property can never be moved from the border. Rather, we recognize that the search of a computer is only as difficult as its owner makes it.[15] *See Hill*, 459 F.3d at 974 (recognizing that some computers are so complicated that they require off-site inspection) (quoting *United States v. Hill*, 322 F. Supp. 2d 1081,

---

[15]It seems unlikely that every potential terrorist or purveyor of child pornography would label his or her contraband so that its incriminating nature is immediately recognizable, like "Kiddie Porn" or "Plot to Destroy America," and place it in the middle of an unprotected computer desktop. Nor is it likely that a criminal or terrorist would go to the trouble of hiding and password protecting such a file, and then volunteer to identify and open it for inspection at the border.

1089 (C.D. Cal. 2004)). Some criminals may leave the evidence of their crimes out for easy discovery. *E.g.*, *Romm*, 455 F.3d at 994. Others, like Cotterman, will choose to hide and encrypt that evidence, requiring law enforcement to conduct more technical and complicated searches. These latter searches necessarily require the availability of more complex equipment and technical personnel—resources that are not easily moved. *Hill*, 459 F.3d at 974 (carrying sophisticated forensic equipment capable of reading computer storage media poses "significant technical problems," and, "without the necessary tools and expertise to deal with them, any effort to read computer files at the scene is fraught with difficulty and risk" (quoting *Hill*, 322 F. Supp. 2d at 1088-89)).

**[11]** The United States urges us to consider the practicality of the situation to assess the reasonableness of what was done. It contends that requiring forensic computer laboratories at all ports of entry throughout the United States would place just the type of unreasonable burden on the Government that our functional equivalent of the border jurisprudence avoids. We agree. Many ports of entry, like Lukeville, are located in remote areas and have minimal staff and equipment because they see so few travelers each day. We cannot conclude that the Fourth Amendment requires that the Government either maintain specialized equipment and personnel with the requisite technical skills at each of these points or be foreclosed from ensuring the integrity of our borders. *See Montoya de Hernandez*, 473 U.S. at 542-43.

**[12]** Unlike a traveler who chooses to cross the border, and thereby tacitly consents to search and seizure, the United States must simply take travelers as it finds them. In this case, the property presented for the privilege of entry was sufficiently complex to permit its relocation to the lab in Tucson—a location where the Government could conduct an adequate search to ensure the property was safe for entry.[16] Its reloca-

---

[16]We do not disturb the district court's finding that the Government could have conducted its search at the border—though we think that

tion was by no means so offensive as to render the Government's conduct unreasonable. *Cf. Hill*, 459 F.3d at 974.

**2**

Cotterman's final claim is that the two-day seizure of his property was unreasonable because Agent Owen could have discovered the child pornography at the Lukeville POE "in a matter of hours." We find this argument entirely unpersuasive.

**[13]** First and foremost, the Supreme Court has concluded that even a seizure of a person at the border does not become unreasonable simply because it lasts for an extended period of time. *Montoya de Hernandez*, 473 U.S. at 542-44 ("[W]e have . . . consistently rejected hard-and-fast time limits. . . . [C]ommon sense and ordinary human experience must govern over rigid criteria." (internal quotation marks omitted)); *see Flores-Montano*, 541 U.S. at 155 n.3. Rather, the test for unreasonableness is whether a detention remained "reasonably related in scope to the circumstances which justified it initially." *Montoya de Hernandez*, 473 U.S. at 542; *see also Caballes*, 543 U.S. at 407. In undertaking that inquiry, we are not to "indulge in 'unrealistic second-guessing . . . .' " *Montoya de Hernandez*, 473 U.S. at 542 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

> "[C]reative judge[s], engaged in post hoc evaluations of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive'

would have only extended the deprivation. To the contrary, we simply do not think that such action was constitutionally required, even if it was possible.

means does not, in itself, render the search unreasonable." Authorities must be allowed "to graduate their response to the demands of any particular situation."

*Id.* (some alterations in original) (citations omitted). Applying these directives, the Court concluded that the more than sixteen-hour detention of a person was not unreasonable, given that the Government had no practical alternative other than to "turn her loose into the interior carrying the reasonably suspected contraband drugs." *Id.* at 542-43.; *cf. Flores-Montano*, 431 U.S. at 155-56 (refusing to require reasonable suspicion to conduct intrusive searches of vehicles); *Arnold*, 533 F.3d at 1008 (extending the *Flores-Montano* rule to searches of computers).

With this framework in mind, we turn to the record to see if the forty-eight hour detention in our case was reasonably related in scope to the circumstances that justified the initial detention at the border. *See Montoya de Hernandez*, 473 U.S. at 542. Testimony at the suppression hearing established the following uncontested facts: (1) ICE agents in Sells were informed of the situation at the Lukeville POE at approximately 12:30 p.m. on Friday, April 6, 2007; (2) it took Agent Brisbine four or five hours to drive back from Lukeville to Tucson with the laptops due to a car accident blocking the main highway; (3) the process of using the equipment in Tucson to find the pictures in the unallocated space took several hours and ran overnight from Saturday to Sunday; (4) Agent Owen's laptop contained some forensic software, but the program would have run much slower off his laptop than off the specialized computers in his forensic laboratory, and he would not have been able to concurrently run the program on both of Cotterman's computers at the same time; and (5) Agent Owen would have had to return to Tucson if any problems arose during a search at the Lukeville POE.

In addition, whereas computer searches of this kind might normally take weeks or months, Agent Owen worked all

weekend, which was not his typical work schedule, to ensure the Cottermans could continue their trip home without delay. As Judge Pyle concluded, "the facts show reasonable diligence and speed in conducting the computer forensic examination."

**[14]** As the record clearly refutes Cotterman's claim that the contraband could have been discovered in a matter of hours, his argument hinges on a determination that the time it took for the agents to return from the Lukeville POE to Tucson—the only time that would not have been implicated if Agent Owen had traveled to the Lukeville POE—was sufficient to render the detention unreasonable. We cannot conclude that it was. Rather, our common sense and experience inform us that the decision to transport the property to the laboratory, instead of transporting the laboratory to the property,[17] resulted in a shorter deprivation. Furthermore, even if we were to contravene the Court's guidance and indulge in "unrealistic second-guessing," *contra Montoya de Hernandez*, 473 U.S. at 542-44, the difference in time would be so inconsequential that it could not render the search unreasonable.

## IV

In sum, this case presents a factual scenario unlike any we have previously seen. What is clear from our precedent and that of the Supreme Court, though, is that the border search doctrine is flexible enough to meet the evolving demands inherent in securing our nation's borders. The Fourth Amendment does not require the United States to categorically demonstrate reasonable suspicion in every case in which property initially searched at the border—and not cleared for entry or released from the Government's control—is relocated to a

---

[17]This also would have forced the Cottermans to either stay in their car in Lukeville or drive back and forth from Sells or Tucson to Lukeville to collect their belongings rather than simply picking them up in the city in which they were already planning to stay.

secondary site for further inspection. Rather, the reasonableness of such searches is better analyzed on a case-by-case basis to determine whether the scope or duration of the intrusion was constitutionally unreasonable.

**[15]** In this case, the initial search and seizure was justified by the Government's broad sovereign authority to secure our borders, *e.g.*, *Montoya de Hernandez*, 473 U.S. at 537 (plenary authority to conduct searches and seizures at the border), and *Arnold* has already clarified that the Government may search the contents of a computer at the border without particularized suspicion. 533 F.3d at 1008. We see no basis to distinguish this case from our prior jurisprudence simply because the complexity of Cotterman's computer necessitated its relocation to a forensic computer laboratory to allow the Government to conduct an adequate search.[18] *Id.* at 1006, 1008-10; *Hill*, 459 F.3d at 975; *see Flores-Montano*, 431 U.S. at 155-56. We further hold that the duration of the deprivation satisfied the common-sense standard established in *Montoya de Hernandez*, 473 U.S. at 542-44, and that continuing the search by transporting the property to the Tucson forensic laboratory could not therefore amount to an unreasonable constitutional deprivation. The district court erred in suppressing the evidence lawfully obtained under border search authority.

**REVERSED and REMANDED.**

---

[18]To the extent that the dissent's arguments to the contrary are not squarely foreclosed by *Flores-Montano*, 431 U.S. at 152, we point out that each was considered and rejected in *Arnold*. 533 F.3d at 1006, 1008-10 ("Arnold has failed to distinguish how the search of his laptop and its electronic contents is logically any different from the suspicionless border searches of travelers' luggage that the Supreme Court and we have allowed. . . . [C]ase law does not support a finding that a search which occurs in an otherwise ordinary manner, is 'particularly offensive' simply due to the storage capacity of the object being searched." (citing *California v. Acevedo*, 500 U.S. 565, 576 (1991))).

## B. Fletcher, Circuit Judge, dissenting:

I respectfully dissent. The "sticking point" of this case is not whether the Government's authority "to subject incoming travelers to inspection for entry also permits the Government to transport property not yet cleared for entry away from the border to complete its search." Maj. Op. at 4219-20. The real issue, as this case is framed by the government and the majority, is whether the Government has authority to *seize* an individual's property in order to conduct an exhaustive search that takes days, weeks, or even months, with *no reason* to suspect that the property contains contraband.[1] In other words, the problem with this case is not that the Government searched Cotterman's computer in Tucson as opposed to Lukeville. The problem is that the Government seized Cotterman's laptop so it could conduct a computer forensic search, a time consuming and tremendously invasive process, without any particularized suspicion whatsoever.

To the contrary, I would hold that officers must have some level of particularized suspicion in order to conduct a seizure and search like the one at issue here, because (1) seizing one's personal property deprives the individual of his valid possessory interest in his property, and (2) authorizing a generalized computer forensic search (untethered to any particularized

---

[1] I do not assume, as does the majority, that Customs and Border Protection officers lacked reasonable suspicion to seize Cotterman's laptop. Op. at 4216-17. On appeal, the Government abandoned its argument before the district court that officers had reasonable suspicion that Cotterman's laptop contained child pornography on account of (1) Cotterman's prior conviction for a child-related sex-offense; (2) the presence of password protected files on Cotterman's computer; and (3) the fact that Cotterman was returning from a lengthy trip to Mexico. Accordingly, I express no view on the presence of reasonable suspicion. I suspect, though, that the Government's decision not to appeal the district court's adverse ruling on reasonable suspicion stems in part from its eagerness to secure our sweeping approval of suspicionless border seizure and search of electronics equipment. *See United States v. Chaudhry*, 424 F.3d 1051, 1054 (9th Cir. 2005) (B. Fletcher, J., specially concurring).

suspicion) permits the Government to engage in the type of generalized fishing expeditions that the Fourth Amendment is designed to prevent.

The "touchstone" of our Fourth Amendment analysis, even at the border, must be reasonableness, but with recognition that the "Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). "Balanced against the sovereign's interests at the border are the Fourth Amendment rights of . . . . [the individual, who is] entitled to be free from unreasonable search and seizure." *Id.* at 539.

The Supreme Court has recognized that a traveler has a Fourth Amendment interest in maintaining possession of his personal property. In *United States v. Place*, 462 U.S. 696, 708 (1983), the Court explained that "detention of luggage within the traveler's immediate possession . . . intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary." Those interests exist, albeit with less force, at the border. *See, e.g., United States v. Flores-Montano*, 541 U.S. 149, 155 (2004).[2] While a traveler cannot have a reasonable expectation that his

---

[2]I disagree with the majority's conclusion that *Flores-Montano* permits as "routine" all property deprivations at the border that are not highly destructive or offensive. *See* Maj. Op at 4219 n. 9 ("[P]roperty deprivation at the border remains routine regardless of the 'degree of instrusiveness' of a search . . . . Only highly destructive or offensive property searches may suffice to render a deprivation non-routine."). *Flores-Montano* considered whether the disassembly and reassembly of a gas tank was permissible at the border. 541 U.S. at 141. The Court recognized that such a procedure interfered with a motorist's possessory interest in his property, but concluded that the degree of interference caused by a "brief procedure that can be reversed without damaging the safety or operation of the vehicle" was justified by the Government's interest in protecting the border. 541 U.S. at 155. *Flores-Montano* did not address the situation at issue here: whether, without reasonable suspicion, a *total* deprivation of the traveler's possessory interests for an indefinite period is permissible.

property will not be searched at the border,[3] I submit that a traveler does have a reasonable expectation that his property will not be searched in a manner that requires it to be taken away from him for weeks or months, unless there is some basis for the Government to believe that the property contains contraband. *Cf. United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376 (1971) (A traveler's "right to be let alone neither prevents the search of his luggage *nor the seizure of unprotected, but illegal*, materials when his possession of them is discovered during such a search") (emphasis added).

The majority appears to recognize that border searches "conducted in a particularly offensive manner" run afoul of the Fourth Amendment. Maj. Op. at 4226, 4227. In considering whether this search was particularly offensive, the majority focuses on the efficiency of Government officials performing the search and on the necessity of transport. Maj. Op. at 4227-29. No one disputes that the CPB officers in this case were diligent. The majority fails, however, to substantively analyze the *nature* of the search itself, and so overlooks the fact that computer forensic searches are highly invasive, and a computer forensic search unlimited by any suspicion of particular criminal activity even more so.

Computers store libraries worth of personal information, including substantial amounts of data that the user never intended to save and of which he is likely completely unaware

---

[3]As the majority acknowledges, *United States v. Arnold*, 533 F.3d 1003, 1008 (9th Cir. 2008) does not control. Op. at 4231. Though *Arnold* held that "reasonable suspicion is not needed for customs officials to search a laptop or other personal electronic storage devices at the border," it did not involve the type of search and seizure at issue here. *Id.* at 1008. In *Arnold*, officials at the border examined the visible files on the computer and found child pornography. *Id.* at 1005. Notably, the officers did not seize the computer for an indefinite period until *after* they identified contraband, and they obtained a warrant *before* conducting an exhaustive forensic search of all the computer's data. *Id.*

(for example, browsing histories and records of deleted files in unallocated space). *See United States v. Flyer*, No. 08-10580, Slip Op at 2419, 2429 (9th Cir. Feb. 8, 2011); *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc). Computers offer "windows into [our] lives far beyond anything that could be, or would be, stuffed into a suitcase for a trip abroad." David K. Shipler, *Can You Frisk a Hard Drive?*, N.Y TIMES, Feb. 20, 2011, at WK5. The majority gives the Government a free pass to copy, review, categorize, and even read all of that information in the hope that it will find *some* evidence of *any* crime.

An exceptionally invasive search of property can constitute a search conducted in a particularly offensive manner. *See United States v. Ramsey*, 431 U.S. 606, 618 n.13 (1977) (reserving the question of whether a search at the border conducted in a particularly offensive manner violates the Constitution); *Kremen v. United States*, 353 U.S. 346, 347 (1957) (holding unconstitutional a search where officers with a warrant to arrest two individuals transported the entire contents of a home to San Francisco for an "exhaustive" search); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 356-58 (1931) (holding unconstitutional a search where officers with a warrant to arrest individuals seized office papers, under threat of force, in order to conduct a "general exploratory search in the hope that evidence of a crime might be found"), *abrogated on other grounds as discussed in Arizona v. Gant*, 129 S. Ct. 1710, 1724 (2009).[4] Given the exhaustive nature of computer forensic searches, I would hold that such searches are "conducted in a particularly offensive manner" unless they are guided by an officer's reasonable suspicion that the computer contains evidence of a *particular* crime.

---

[4] *Kremen* and *Go-Bart* do not involve border searches. Nevertheless, the Supreme Court cited both cases in *Ramsey* as support for the proposition that a search at the border conducted in a particularly offensive manner would violate the Fourth Amendment. 431 U.S. at 618 n.3.

The majority purports to limit the Government's authority, stating that courts will continue to consider "whether a detention remained 'reasonably related in scope to the circumstances which justified it.' " Maj. Op. at 4230, *citing Montoya de Hernandez*, 473 U.S. at 542. This begs the question—what circumstances justify the seizure and search? In *Montoya de Hernandez*, the Government had reasonable suspicion that the traveler was smuggling drugs in her alimentary canal; therefore, the detention was reasonable, but only for as long as required to determine that the traveler was or was not smuggling drugs. *See* 473 U.S. at 542-44. Here, the majority authorizes seizure of personal property to permit the Government to "fully allay its concerns" about the property. Maj. Op. at 4222. In a search designed to fully allay the Government's concerns, the scope of the search will be determined by the Government's desire to be thorough,[5] and the length of the seizure by the Government's convenience.[6] The majority essentially allows the Government to set its own limits— surely the Fourth Amendment demands more.

---

[5]The Government could seek to ensure that there is no child pornography or information about terrorist plots on the computer. But it could also translate any documents in a foreign language, ensure that none of the seemingly innocuous pictures are actually encrypted messages, verify the licenses on any music or movies on the computer, review financial logs for evidence of insider trading, read email correspondence to ensure that there is no communication with known criminals—the list of possible "concerns" is endless, particularly where the Government expressly seeks to use its border search power to uncover evidence of crimes unrelated to contraband smuggling or national security. *See* United States Customs and Border Protection Directive No. 3340-049, August 20, 2009.

[6]The majority suggests that conducting a forensic search in a distant lab is faster than or equivalent to conducting a search at the border. Maj. Op. at 4232. That misses the point. A computer search in a forensic lab will *always* be equivalent to an *identical* search at the border. The duration of a computer search is not controlled by *where* the search is conducted. The duration of a computer search is controlled by what one is looking for and how one goes about searching for it. *See* Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 HARV. L.REV. 531, 544 (2005) ("[A]nalysis of a computer hard drive takes as much time as the analyst has to give it.").

I add my voice to the chorus lamenting the apparent demise of the Fourth Amendment. *See, e.g.*, *United States v. Pineda-Moreno*, 617 F.3d 1120, 1121 (9th Cir. 2010) (Kozinski, J., in a dissent from denial of rehearing en banc joined by Reinhardt, Wardlaw, Paez and Berzon); *United States v. Seljan*, 547 F.3d 993, 1014-19 (9th Cir. 2008) (en banc) (Kozinski, J., dissenting). I dissent.